14 CV 6842

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

RECEIVED
AUG 22 2014
U.S.D.C. S.D.N.Y.
CASHIERS

SAUL CHILL and SYLVIA CHILL,

-v.-

DAVIS SELECTED ADVISERS, L.P. and
DAVIS SELECTED ADVISERS-NY, INC.,

Defendants.

Civil No. _____

**COMPLAINT**

Jury Trial Demanded



## TABLE OF CONTENTS

I.   NATURE OF THE ACTION ........................................................................ 1

II.  JURISDICTION AND VENUE ................................................................... 2

III. PARTIES ..................................................................................................... 2

IV.  SUBSTANTIVE BACKGROUND ALLEGATIONS ................................. 3

A.  The Mutual Fund Industry and the Structural Conflict of Interests
Between Investment Advisers and the Captive Funds Under Their Control ..................... 3

B.  The Investment Company Act of 1940, as Amended with Section 36(b),
Addresses this Conflict of Interests by Prohibiting Excessive Investment
Advisory Fees ........................................................................................ 4

C.  The Fund's Organization and Operations ..................................... 5

D.  Defendants' Investment Advisory Services to the Fund ................. 6

E.  The Davis Fund Complex, and the Fund's Flagship Presence within It ............................ 9

V.   DEFENDANTS EXTRACTED EXCESSIVE INVESTMENT ADVISORY FEES
FROM THE FUND ..................................................................................... 10

A.  Comparative Fee Structures ............................................................ 10

1.  The Investment Advisory Fee Rates Applied to the Fund ........................................... 11

2.  Comparing Fees Charged to Captive and Arm's Length
Investment  Advisory Clients .............................................................. 12

a)  Davis Provides Identical Investment Advisory Services to  Third-Party
Fund/Institutional Clients for Lower Fees ................................... 12

b)  Davis Provides Similar Investment Advisory Services to
Further Arm's-Length Clients for Lower Fees ............................ 18

3.  Comparing Current Fund Fees to Prior Fund Fees ............................ 21

B.  Economies of Scale ........................................................................... 23

1.  Economies of Scale, Their Role in Excessive Fees, and the Use of  Breakpoints
to Address these Matters .................................................................... 24

2.  The Fund Generated Significant Economies of Scale with Respect to  Investment
Advisory Services, but Davis Extracted Excessive Fees by  Failing to Share the
Benefits of Such Economies of Scale ................................................. 27

3.  Comparative Analysis of Fund and Subadvised Fund Breakpoints
Further Exposes Defendants' Excessive Fees and Retention of
Economy of Scale Benefits ................................................................. 30

C.  The Nature and Quality of Services Provided to the Fund's Shareholders ..................... 37

1.  The *Nature* of the Services Davis Provided to the Fund under the IAA ..................... 37

2.  The *Quality* of the Services Davis Provided to the Fund ............................................. 39

3.      Comparison of the Nature and Quality of the Services Davis Provided to the Fund and to the Subadvised Funds Further Indicates That  Davis Charged Excessive Fees to the Fund ................................................................ 41

D.      The Profitability of the Fund to the Advisor .................................................... 45

E.      Fall-Out Financial Benefits Attributable to the Fund ....................................... 48

F.      The Care and Conscientiousness of the Fund's Directors in Approving Investment Advisory Fees ........................................................... 50

1.      The Board Approved Substantively Excessive Advisory Fees .................................... 50

2.      The Board's Deficient Approval Process ............................................................... 50

a)      Defendants' Domination of the Fund's Directors .................................................. 52

b)      Defendants Set Their Own Advisory Fees by Providing  Proposed Fees that Fund Directors Rubber-Stamped ....................................... 53

c)      The Fund Directors' Deficient Process for Evaluation and  Determination of Advisory Fees ....................................................................... 54

VI.     THE EXCESSIVE INVESTMENT ADVISORY FEES HARM THE FUND ................ 58

VII.    CAUSES OF ACTION ............................................................................................... 58

VIII.   PRAYER FOR RELIEF ............................................................................................. 59

IX.     JURY TRIAL DEMANDED ....................................................................................... 60

**List of Tables**

Table 1 - The Davis Funds Complex                                        9

Table 2 - The Fund's Investment Advisory Fee Rates                       11

Table 3 - Advisory Fees Charged by Davis to the Subadvised Pattern Funds   13

Table 4 - Advisory Fees Charged by Davis to the Other Subadvised Funds   18-19

Table 5 - The Fund's Investment Advisory Fee Rates in 2007 and 2013      21

Table 6 - Investment Advisory Fees Paid by the Fund to Davis:  1995-2013   29

Table 7 - Comparative Breakpoint Analysis                               31-32

Table 8 - SubAdvised Funds' Responses to the Quality of
          Davis' Investment Advisory Services                           42-44

Plaintiffs Saul Chill and Sylvia Chill ("Plaintiffs"), by Plaintiffs' undersigned counsel, bring this action against defendants Davis Selected Advisers, L.P. ("Davis Advisors") and Davis Selected Advisers-NY, Inc. ("Davis-NY") (collectively, "Davis" or "Defendants") and allege as follows.  The following allegations are based on knowledge as to Plaintiffs and Plaintiffs' own actions, and on information and belief, based on the investigation of Plaintiffs' counsel, as to all other matters.  Such investigation included, but was not limited to, a review and analysis of documents filed by Defendants and their affiliates with the Securities Exchange Commission ("SEC"), documents filed with the SEC by third parties concerning investment vehicles managed by Defendants, and other matters of public record.  Many of the facts supporting the allegations contained herein are known only to Defendants or are exclusively within their custody and/or control.  Plaintiffs believe that a reasonable opportunity for discovery will yield additional, substantial evidentiary support for the allegations herein.

## I.   NATURE OF THE ACTION

1.     Plaintiffs bring this action against Defendants on behalf of and for the benefit of the Davis New York Venture Fund (the "Fund") pursuant to Section 36(b) of the Investment Company Act of 1940 (the "ICA"), 15 U.S.C. § 80a-35(b).

2.     Defendants, as the Fund's investment advisers, manage the Fund's asset portfolio, for which they receive an annual fee from the Fund for providing such and other investment advisory services, as further specified herein.

3.     Under Section 36(b), Defendants owe a fiduciary duty to the Fund with respect to the investment advisory fees paid by the Fund.

4.     Defendants breached that fiduciary duty by receiving investment advisory fees from the Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendants and could not have been the product of arm's-length bargaining (hereinafter, "excessive" fees).

5.     Plaintiffs bring this action to recover for the Fund the excessive and unlawful investment advisory fees charged in violation of Section 36(b), as well as lost profits and other actual damages caused by the Fund's payment of those fees.

## II.     JURISDICTION AND VENUE

6.     The claim asserted herein arises under Section 36(b) of the ICA, 15 U.S.C. § 80a-35(b).

7.     This Court has jurisdiction of the claim pursuant to Sections 36(b)(5) and 44 of the ICA, 15 U.S.C. §§ 80a-35(b)(5), 80a-43, and 28 U.S.C. § 1331.

8.     Venue is proper in this judicial district pursuant to Section 44 of the ICA, 15 U.S.C. § 80a-43, and 28 U.S.C. § 1391 because Defendants are inhabitants of this district, maintain offices in this district, and/or transact business in this district, and because certain of the acts and transactions giving rise to Plaintiffs' claim occurred in this district.

## III.     PARTIES

9.     Plaintiffs Saul Chill and Sylvia Chill, residents of the State of New York, are shareholders in the Fund and have continuously owned shares in the Fund jointly since at least 2005.

10.     Defendant Davis Advisors is organized as a limited partnership under Colorado law, with principal offices in Tucson, Arizona.  A SEC-registered investment advisor, Davis Advisers provides investment advisory services to registered investment companies such as mutual funds, unregistered investment companies, and private accounts.  As of December 31, 2013, Davis Advisors managed $47.13 billion of client assets on a discretionary basis.  Its limited partnership units are owned, directly and/or through holding companies, largely by members of the Davis family, including Christopher Davis and Andrew Davis, who serve as portfolio managers for most of mutual funds advised by Davis Advisers (including the Fund, one of whose two portfolio managers is Christopher Davis).

11.     Defendant Davis-NY is a corporation organized under Delaware law, with its principal office located at 620 Fifth Avenue, New York, New York. Davis-NY is a wholly-

owned affiliate of Davis Advisors, and its only business is to provide investment advisory services on behalf of Davis Advisors through sub-advisory agreements with Davis Advisors.

## IV.    SUBSTANTIVE BACKGROUND ALLEGATIONS

### A.    The Mutual Fund Industry and the Structural Conflict of Interests Between Investment Advisers and the Captive Funds Under Their Control

12.    As a practical and historical matter, mutual funds have typically been created, established and organized by investment advisory firms, who then provide investment advisory services to such mutual funds in exchange for investment advisory fees.  Additionally and often, affiliates of such investment advisory firms are likewise engaged by such mutual funds to provide further services, including much of the "back office" and/or operational mechanics requisite for mutual fund functioning.  Likewise, persons affiliated with such investment advisers are typically appointed to serve on such mutual funds' boards of directors.

13.    As a result of the close ties between such mutual funds and their investment adviser sponsors, and of the peculiar dependence of the former upon the latter, "the forces of arm's-length bargaining do not work in the mutual fund industry in the same manner as they do in other sectors of the American economy."  *See* S. Rep. No. 91-184, at 5 (1969).

14.    More concretely, because "a typical [mutual] fund is organized by its investment adviser which provides it with almost all management services and because it shares are bought by investors who rely on that service, *a mutual fund cannot, as a practical matter, sever its relationship with the advisor.*"  *Id.* (emphasis added).

15.    The peculiar dependence of mutual funds upon their investment advisor sponsors makes such funds, in effect, "captive" to their investment advisers.  Mutual funds established by investment advisor sponsors are hereinafter referred to as "Captive Funds."

16.    Historically, Captive Funds' dependence on and/or loyalty to their investment advisors has allowed investment advisors and their affiliates a decided advantage in negotiating the terms of the contractual relationships between them and the Captive Funds.  In essence,

because mutual funds cannot (and do not) "walk away" from their investment advisors, mutual funds are forced to accede to the terms and conditions proposed and preferred by their investment advisors.[1]  Lacking the normal degree of independence and arm's-length distance, such Captive Funds often drift under the influence of, or into the *de facto* control of, the investment advisor.

17.     Investment advisory fees are one of the principal matters affected by this state of affairs.  While it is in the interest of the mutual fund, and mutual fund investors/shareholders, to secure investment advisory fees that are as low as possible, the investment advisor's interests are the very opposite:  to secure investment advisory fees as high as possible.  Additionally, the influence and/or *de facto* control exerted by the investment adviser over the Captive Fund creates a conflict of interest within the investment advisor itself:  on the one hand, it wishes to secure high fees for itself, but on other hand, to the extent it possesses influence over the Captive Fund, it – at least in theory – should be pressing against itself to negotiate a lower payout of fees.

18.     Historically, such conflicts of interests have generally been resolved in investment advisors' favor and to Captive Funds' detriment.  As a result of such structural factors, Captive Funds have historically paid – and often continue today to pay – relatively high investment advisory fees.

**B.     The Investment Company Act of 1940, as Amended with Section 36(b), Addresses this Conflict of Interests by Prohibiting Excessive Investment Advisory Fees**

19.     In 1940, responding to numerous problems and abuses in the then-lightly regulated mutual fund industry, Congress enacted the ICA in order to create standards of operation and care applicable to investment advisers and their affiliates.  In its "Findings and Declaration of Policy" preamble to the ICA, Congress recognized that "investment companies are organized, operated [and] managed . . . in the interest of . . . investment advisers . . . rather than in the interests of [mutual fund shareholders.]"

---

[1] In theory, a mutual fund *can* "walk away."  In practice, however, this almost never happens.  "Walking away" is thus not exactly impossible, but rather, as practical matter, so very difficult that it is in effect all but impossible.

20.     Notwithstanding the ICA's initial and various provisions, decades of excessive investment advisory fees extracted from Captive Funds thereafter followed.

21.     Consequently, Congress amended the ICA in 1970, adding a new Section 36 to address the matter of excessive investment advisory fees.  Recognizing the structural conflict of interests possessed by investment advisers with respect to their Captive Funds, Section 36:  (1) imposed a fiduciary duty on investment advisers with respect  to the investment advisory fees they charged; and (2) allowed the SEC and/or mutual fund shareholders to bring a federal cause of action against investment advisors for breach of such fiduciary duties.  Section 36(b) provides, in pertinent part:

> [T]he investment adviser of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services, or of payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment adviser or any affiliated person of such investment adviser.  An action may be brought under this subsection by the Commission, or by a security holder of such registered investment company on behalf of such company, against such investment advisers, or an affiliated person of such investment advisor, or any other person enumerated in subsection (a) of this section who has a fiduciary duty concerning such compensation or payments, for breach of fiduciary duty in respect to such compensation or payments paid by such registered investment company or by the security holders thereof to such investment adviser or person.

**C.     The Fund's Organization and Operations**

22.     The Fund is an open-end management investment company, also known as a "mutual fund," registered under the ICA.  Like other mutual funds, the Fund is a type of collective investment that pools money from investors and invests the money in a portfolio of securities.  The Fund issues shares to investors, such as Plaintiff, who invest money in the Fund, and those investors become shareholders in the Fund. Each share issued by the Fund represents, and may be redeemed for, a pro rata interest in the Fund's underlying portfolio of securities (less any fees and other liabilities).

23.     Like most other mutual funds, the Fund does not have employees or facilities of its own. The Fund's operations are conducted by external service providers pursuant to contracts with the Fund.

24.     Defendants serve as the Fund's investment advisers and, in that capacity, are responsible for managing the Fund's portfolio of securities, including researching potential investments and deciding which securities will be purchased for or sold from the portfolio.

25.     Other service providers, including certain of Defendants' affiliates, provide other services to the Fund and its shareholders, such as communicating with shareholders about the Fund, maintaining records of each shareholder's ownership of Fund shares, and managing the process by which Fund shares are purchased by or redeemed from shareholders. For example, a "transfer agent" provides much of the day-to-day operational services requisite for mutual fund functioning, such as:    (1) receiving and processing mutual fund share purchase and sale/redemption requests; (2) transferring shares; (3) preparing shareholder account statements and confirmations; (4) responding to shareholder inquiries concerning account status, portfolio performance, distributions and share price; and (5) providing shareholders with copies of account histories.    Further fund operating expenses, such as custodial, audit and accounting, legal, compliance and marketing expenses, all of which fall outside the investment advisor's domain and are provided by other entities, are separately borne by and charged to the Fund.

26.     The Fund is overseen by a Board of Directors (the "Board"), which is responsible for selecting and monitoring the Fund's service providers, among other things.  The same Board oversees each of the funds in the Davis Fund Complex.

### D.     Defendants' Investment Advisory Services to the Fund

27.     Defendants serve as investment advisers to the Fund pursuant to an Investment Advisory Agreement between Davis Advisors and the Fund (the "IAA") and a subadvisory agreement between Davis Advisors and Davis-NY.

28.     The IAA requires Davis to provide certain investment advisory services to the Fund.  Further discussed herein, these investment advisory services are essentially two-fold:

a. **Portfolio Selection Services**.  In their largest and core part, such services include researching potential investments, deciding which securities to purchase for or sell from the Fund's investment portfolio, and arranging for the execution of purchase and sale orders on behalf of the Fund (hereinafter, "Portfolio Selection Services").

b. **Other Services**.  The IAA also requires Davis: (1) to maintain certain books and records relating to the investment advisory services provided to the Fund; and (2) to report to the Fund's Board regarding the investment advisory services (hereinafter, "Other Services").

29.     In its Form ADV and in Fund prospectuses, both filed annually with the SEC, Davis further details the Portfolio Selection Services it provides to the Fund.  Specifically, Davis describes both the *means* (the principal investment strategies it employs) and the *ends* (the principal investment objectives it seeks to produce) of such Portfolio Selection Services.

30.     According to the Fund's most recent prospectus, dated December 2, 2013 (the "2013 Prospectus"), the Fund's "investment objective: is "long-term growth of capital," sought primarily through investments in "common stocks . . . issued by large companies with market capitalizations of at least $10 billion."

31.     To achieve this investment objective, Davis employs an investment strategy that it terms the "Davis Investment Discipline."  As the 2013 Prospectus explains:

> Davis Advisors manages equity funds using the Davis Investment Discipline. Davis Advisors conducts extensive research to try to identify businesses that possess characteristics that Davis Advisors believes foster the creation of long-term value, such as proven management, a durable franchise and business model, and sustainable competitive advantages. Davis Advisors aims to invest in such businesses when they are trading at discounts to their intrinsic worth. Davis Advisors emphasizes individual stock selection and believes that the ability to evaluate management is critical. Davis Advisors routinely visits managers at their places of business in order to gain insight into the relative value of different businesses....

7

> After determining which companies Davis Advisors believes the Fund should own, Davis Advisors then turns its analysis to determining the intrinsic value of those companies' equity securities. Davis Advisors seeks companies whose equity securities can be purchased at a discount from Davis Advisors' estimate of the company's intrinsic value based upon fundamental analysis of cashflows, assets and liabilities, and other criteria which Davis Advisors deems to be material on a company by company basis. Davis Advisors' goal is to invest in companies for the long term (ideally five years or longer, although this goal may not be met). Davis Advisors considers selling a company's equity securities if the securities' market price exceeds Davis Advisors' estimates of intrinsic value, if the ratio of the risks and rewards of continuing to own the company's equity securities is no longer attractive, or to raise cash to purchase a more attractive investment opportunity, satisfy net redemptions, or other purposes.

*See also* Davis Form ADV Part 2, dated March 28, 2014 (hereinafter, "Form ADV"), at 8 (near-verbatim statement).

32.   Davis' Form ADV, as well as the Fund's prior prospectus dated November 28, 2012 (the "2012 Prospectus"), list particular core elements of the Davis Investment Discipline:

> Over the years, Davis Advisors has developed a list of characteristics that it believes help companies to create shareholder value over the long term and manage risk. While few companies possess all of these characteristics at any given time, Davis Advisors searches for companies that demonstrate a majority or an appropriate mix of these characteristics.

> ### *First Class Management*

> - Proven Track Record
> - Significant Alignment of Interests in Business
> - Intelligent Application of Capital

> ### *Strong Financial Condition and Satisfactory Profitability*

> - Strong Balance Sheet
> - Low Cost Structure
> - High Returns on Capital

> ### *Strong Competitive Positioning*

- Non-Obsolescent Products/Services
- Dominant or Growing Market Share
- Global Presence and Brand Names

**E.    The Davis Fund Complex, and the Fund's Flagship Presence within It**

33.    In addition to the Fund, Defendants provide investment advisory services to at least nine other Captive Mutual Funds bearing the Davis name, including the Davis International Fund, the Davis Global Fund, the Davis Opportunity Fund, the Davis Financial Fund, the Davis Real Estate Fund, the Davis Appreciation and Income Fund, the Davis Government Bond Fund, the Davis Government Money Market Fund, and the Davis Research Fund (collectively, with the Fund, the "Davis Fund Complex").

34.    As Table 1 below demonstrates, the Fund is by far the largest of the funds in the Davis Fund Complex.  The Fund's $20.8 billion of assets under management ("AUM") more than octuple the combined AUM of all the other funds in the Davis Fund Complex ($2.55 billion), and alone constitute 89% of all AUM in the Davis Fund Complex:

**Table 1**
**The Davis Fund Complex**

| Fund | AUM (as of June 30, 2014) |
|------|---------------------------|
| Davis New York Venture Fund | $   20,800,000,000 |
| Davis International Fund | $        73,400,000 |
| Davis Global Fund | $      190,000,000 |
| Davis Opportunity Fund | $      629,600,000 |
| Davis Financial Fund | $      686,100,000 |
| Davis Real Estate Fund | $      238,600,000 |
| Davis Appreciation and Income Fund | $      323,200,000 |
| Davis Government Bond Fund | $        94,400,000 |
| Davis Government Money Market Fund | $      273,100,000 |
| Davis Research Fund | $        42,633,240 |
| Total - Davis Fund Complex | $   23,351,033,240 |

35.     The $23.35 billion of AUM in the Davis Fund Complex account for half (49.54%) of the total AUM under Davis' discretionary management, which totaled, as of December 31, 2013, $47.129 billion.   Because, as further demonstrated herein, Davis extracts higher investment advisory fees from the Captive Funds in the Davis Fund Complex than it does from arm's length clients for its investment advisory services, Davis' investment advisory fee income is in largest part derived from the Captive Funds in the Davis Fund Complex.

36.     Moreover, as the Fund comprises nearly 90% of total AUM in the Davis Fund Complex, the higher investment advisory fees that Davis generates from its Captive Funds are in substantial entirety fees extracted from the Fund.  For the last fiscal year for which information is available (fiscal 2013, ended July 31, 2013), the Fund paid $101.96 million in investment advisory fees to Davis.  During the same period, Davis' combined investment advisory fees from the nine other funds in the Davis Fund Complex totaled approximately $14.0 million.

## V.     DEFENDANTS EXTRACTED EXCESSIVE INVESTMENT ADVISORY FEES FROM THE FUND

37.     Since the ICA was amended through Section 36, judicial standards have evolved to determine whether or not investment advisory fees were excessive and/or breached fiduciary duties owed to the Fund.  These standards are addressed *seriatim* in Sections V.A-F below.

### A.     Comparative Fee Structures

38.     According to its most recent Form ADV, Davis, as of December 31, 2013, provided investment advisory services for nearly 200 clients, including the Fund, other Captive Funds, third-party non-Captive Funds, and other third-party institutional clients.  Total assets under Davis' discretionary management totaled $47.1 billion.

39.     The identities of most such clients, and the investment advisory fees charged by Defendants to most such clients, are matters within the peculiar knowledge and exclusive control of Defendants, for which information is not publicly available.  Notwithstanding, Plaintiffs' investigation has identified multiple current and former Davis clients, and the investment

advisory fees they paid for Defendants' investment advisory services. As set forth below, such publicly-available information shows:

    a. Defendants extracted higher investment advisory fees from the Fund, a Captive Fund, than from third-party, arm's length mutual fund and institutional clients; even where

    b. The investment advisory services Defendants provided to such clients were substantively similar – *and in many cases effectively identical* – to those Defendants provided to the Fund.

40.    Upon information and belief, discovery concerning Defendants' other investment advisory clients and the fees will produce further evidence demonstrating the same.

### 1. The Investment Advisory Fee Rates Applied to the Fund

41.    In exchange for the investment advisory services provided by Davis to the Fund, the IAA requires the Fund to pay Davis Advisors an annual fee calculated as a percentage of the Fund's AUM. Davis Advisors, in turn, allocates a portion of the investment advisory fees it receives from the Fund to Davis-NY pursuant to a subadvisory agreement between Defendants.

42.    The Fund's current investment advisory fee rate is set forth in Table 2 below:

**Table 2**
**The Fund's Investment Advisory Fee Rates**

| Fund AUM | Fee Rate |
|---|---|
| up to $3 billion | 0.55% |
| from $3 billion to $4 billion | 0.54% |
| from $4 billion to $5 billion | 0.53% |
| from $5 billion to $6 billion | 0.52% |
| from $6 billion to $7 billion | 0.51% |
| from $7 billion to $10 billion | 0.50% |
| from $10 billion to $18 billion | 0.485% |
| from $18 billion to $25 billion | 0.47% |
| from $25 billion to $33 billion | 0.455% |
| from $33 billion to $40 billion | 0.44% |
| from $40 billion to $48 billion | 0.425% |
| from $48 billion to $55 billion | 0.41% |
| over $55 billion | 0.395% |

43.     Pursuant to the above schedule, the Fund, for its most recent fiscal year for which information is available (ended July 31, 2013), with average AUM slightly exceeding $20 billion,  paid investment advisory fees of $101.96 million, representing an effective investment advisory fee rate of 50 basis points, or 0.50% (the weighted average of the rates paid by the Fund on each level of AUM -- *i.e.*, 55 basis points on the first $3 billion, 54 basis points on the next $1 billion, 53 basis points on the next $1 billion, etc.) (the "blended rate").

### 2.     Comparing Fees Charged to Captive and Arm's Length Investment Advisory Clients

#### a)     Davis Provides *Identical* Investment Advisory Services to Third-Party Fund/Institutional Clients for Lower Fees

44.     Table 3 below lists nine (9) current and/or former arm's length institutional Davis clients that:  (1) not only contracted for and received mutual fund investment advisory services from Davis pursuant to investment sub-advisory agreements; but (2) as detailed below, received apparently *identical* Portfolio Selection Services as those Davis provided to the Fund. [2] The provision of *identical* such services, as further detailed below, makes this comparison an especially apt, apples-to-apples one. Table 3 demonstrates that investment advisory fees that arm's-length clients paid to Davis were substantially lower than the fees Davis extracted from the Fund, notwithstanding Davis' provision of identical Portfolio Selection Services.

---

[2] The information in Table 3 was extracted from:  (1) SEC filings made by the financial institutions sponsoring the Davis-subadvised funds; and (2) Davis' actual investment advisory contracts with respect to such funds.  The funds listed in Table 3, were, in effect discrete "sub-funds" or "portfolios" within larger investment vehicles registered and operating as open-ended investment companies, creating in effect a "fund of fund" structure.  At the level of the "master fund" (identified as the "Sponsor" in Table 3), investors invested in the "master fund" and allocated such investments among the offered discrete sub-funds or portfolios.  The master fund's investment advisor (identified as the "Advisor" in Table 3) provided investment advisory services to the master fund, which included selection and supervision of the sub-funds and portfolios offered, as well as of sub-advisors to such sub-funds and portfolios.  At the level of the sub-fund or portfolio (identified as the "Fund" in Table 3), the investment advisor provided investment advisory services to each of the sub-funds or portfolios in one of two ways: either (1) providing such services itself, or (b) selecting, retaining and supervising a sub-advisor, hired by the advisor, to provide investment advisory services.  In either case, the investment adviser received investment advisory fees from the Fund and/or Sponsor.  In the latter case, the sub-advisor received investment advisory fees from the investment advisor, with whom it had contracted to provide investment advisory services.  The funds listed in Table 3 were funds where Davis had been retained as sub-advisor to provide investment advisory services.

**Table 3**
**Advisory Fees Charged by Davis to the Subadvised Pattern Funds**

| Fund | Sponsor | Advisor | Sub-advisor | Davis' Sub-Advisory Fees | | |
|------|---------|---------|-------------|-----------------|----------|-------------------|
| | | | | AUM Breakpoints | Fee Rate | Blended Rate ($20.8 Billion AUM) |
| **AZL Davis NY Venture Fund** | Allianz Variable Insurance Products Trust | Allianz Inv. Mgmt. LLC | Davis | $0 - $100 million | 0.45% | 0.3514% |
| | | | | $100 - $500 million | 0.40% | |
| | | | | $500 million + | 0.35% | |
| **Columbia Variable Portfolio - Davis New York Venture Fund** | Columbia Funds Variable Series Trust II | Columbia Mgmt. | Davis | $0 - $100 million | 0.45% | 0.2550% |
| | | | | $100 - $500 million | 0.40% | |
| | | | | $500 million - $1 billion | 0.30% | |
| | | | | $1 billion + | 0.25% | |
| **DWS Davis Venture Value VIP** | DWS Variable Series II | DIMA | Davis | $0 - $100 million | 0.50% | 0.4014% |
| | | | | $100 - $500 million | 0.45% | |
| | | | | $500 million + | 0.40% | |
| **EQ/Davis New York Venture Portfolio** | EQ Advisors Trust | AXA Equitable Funds Mgmt. Group, LLC | Davis | $0 - $150 million | 0.43% | 0.3514% |
| | | | | $150 - $500 million | 0.40% | |
| | | | | $500 million + | 0.35% | |
| **Genworth Davis NY Venture Fund** | Genworth Variable Insurance Trust | Genworth Financial Wealth Mgmt. | Davis | all amounts | 0.40% | 0.4000% |
| **ING Davis New York Venture Portfolio** | ING Partners, Inc. | Directed Services LLC | Davis | $0 - $50 million | 0.35% | 0.3007% |
| | | | | $50 - $500 million | 0.325% | |
| | | | | $500 million + | 0.30% | |
| **Metropolitan Davis Venture Value Portfolio** | Metropolitan Series Fund | Metlife Advisers, LLC | Davis | $0 - $100 million | 0.45% | 0.3300% |
| | | | | $100 - $500 million | 0.40% | |
| | | | | $500 million - $3 billion | 0.35% | |
| | | | | $3 billion + | 0.325% | |
| **SC Davis Venture Value Fund** | Sun Capital Advisers Trust | Sun Capital Advisers LLC | Davis | $0 - $100 million | 0.45% | 0.3514% |
| | | | | $100 - $500 million | 0.40% | |
| | | | | $500 million + | 0.35% | |
| **SunAmerica Davis Venture Value Portfolio** | SunAmerica Series Trust | SunAmerica Asset Mgmt. Corp. | Davis | $0 - $100 million | 0.45% | 0.3514% |
| | | | | $100 - $500 million | 0.40% | |
| | | | | $500 million + | 0.35% | |
| **AVERAGE** | | | | | | 0.3437% |

13

45.     As Table 3 indicates, Davis' investment advisory fees were invariably and substantially lower for such clients than for the Fund (or, indeed, than for most other Captive Funds in the Davis Fund Complex).  The Fund paid Davis, based on $20.8 billion of Fund AUM, blended investment advisory fees of 0.50% -- which, at $20.8 billion AUM, would yield a fee of $104 million.  Arm's length institutional clients, however, negotiated more favorable rates from Davis, so that for the same AUM ($20.8 billion) they would have paid, on average, blended investment advisory fees of 0.3437% (*i.e.*, $71.5 million).

46.     The difference between the fees paid by arm's length versus Captive clients – $32.5 million per year – is substantial:  and all the more so in light of the fact that the Portfolio Selection Services received were *identical*.

47.     Each of the nine funds listed in Table 3 bears a name, typically incorporating some or all of the phrase "Davis New York Venture," similar, or nearly identical, to the Fund's. In fact, each of these nine funds (hereinafter, the "Subadvised Pattern Funds" was a *de facto* extension or copy of the Fund, though segregated in different legal vehicles with different fee structure overlays:

    a.  **Davis Made All Investment Decisions for the Subadvised Pattern Funds**.
        Examination of SEC filings relating to the Subadvised Pattern Funds –
        including Registration Statements and Prospectuses for the Subadvised Pattern
        Funds and exhibits thereto (including investment sub-advisory agreements) –
        shows that although each of the Subadvised Pattern Funds had retained an
        affiliate of the sponsor as their investment advisor, *in all cases the actual
        Portfolio Selection Services were subcontracted out to Davis through
        investment sub-advisory agreements with Davis*.[3]

---

[3] For example:  (1) for the Sun Capital Davis Venture Value Fund, Davis was obligated to "provide the Fund with investment advice and investment management services concerning the investments of the Fund" and, more specifically, "determine what securities shall be purchased, held or sold by the Fund. . . "; (2) for the Genworth Davis NY Venture Fund, Davis was obligated to "make[] investment decisions for the Fund and in connection with such investment decisions, places purchase and sell orders for securities. . ."; (3) for the DWS Venture Value VIP

b. **Davis Pursued Identical Investment Objectives and Used Identical Investment Strategies in the Subadvised Pattern Funds**.  Examination of SEC filings relating to the Subadvised Pattern Funds – including Registration Statements, Prospectuses, Semi-Annual Reports and Annual Reports – further demonstrates that the stated "Investment Objective" and "Principal Investment Strategies" for each of the Subadvised Pattern Funds was substantively – and often exactly – identical to the Fund's stated investment objective and investment strategies (as set forth above at ¶¶ 29-32).   For example, the stated "Investment Objective" of the Subadvised Pattern Funds was either exactly identical ("long-term growth of capital" through equity investments in large-cap companies) to the Fund's, or substantively so ("growth of capital"). Likewise, the Subadvised Pattern Funds' "Principal Investment Strategies" included explicit or substantive recitations of the "Davis Investment Discipline" used for the Fund (as set forth above at ¶¶ 31-32).   In sum, Davis managed the Subadvised Pattern Funds with the same means, methods, and goal as the Fund.

c. **The Subadvised Pattern Funds Held Substantially the Same Securities as the Fund, in Substantially the Same Proportions.**   Examination of SEC filings relating to the Subadvised Pattern Funds – including Registration Statements, Prospectuses, Semi-Annual Reports and Annual Reports – further demonstrates that the portfolio holdings of the Subadvised Pattern Funds were substantially similar to each other and to the Fund itself.   This similarity was the result of the fact that all these funds were commonly managed by Davis

---

Fund, Davis was obligated to "manage[] the investment and reinvestment of the Portfolio's assets. . ."; (4) for the EQ/Davis New York Venture Portfolio, Davis was obligated to "formulate and implement a continuous investment program for the Portfolio [and] take whatever steps are necessary to implement the investment program for the Portfolio by arranging for the purchase and sale of securities and other investments. . ."; (5) and (6) for the SunAmerica Davis Venture Value Portfolio and the Metropolitan Davis Venture Value Portfolio, Davis was obligated to "manage the investment and reinvestment of the assets of the [] Portfolio. . ."; etc.

using identical strategies to achieve identical goals. Marginal differences between the portfolios were in large part the result of difference in *timing* rather than in investment advice (*e.g.*, each fund, legally distinct and with separate investor bases, received different inflows of cash to be invested at different times).

d. **The Performance of the Subadvised Pattern Funds Was Substantially Similar to that of the Fund.** Examination of the same materials described above further indicates that the Subadvised Pattern Funds performed, in large part, similarly to each other and to the Fund. This similarity was likewise the result of the fact that all these funds were commonly managed by Davis using identical strategies in pursuit of identical goals. Marginal performance differences were in large part due, as described immediately above, to accidents of timing.

48.     Davis itself admits, in its Form ADV:  (1) how the portfolios of certain of its clients "are patterned after model portfolios or designated mutual funds managed by Davis;" (2) how such clients' portfolios are therefore "similar to, but not exactly the same as, the model portfolios or designated mutual funds;" (3) how such clients' portfolios therefore exhibit "similar, but not identical" performance; and (4) how such differences in portfolios and performance would result from "different timing of cash flows (*i.e.*, the "timing of when portfolio securities are purchased and sold in response to cash flows") as well as other matters.

49.     Indeed, in its Form ADV and its December 2, 2013 Statement of Additional Information ("Davis 2013 SAI"), Davis describes its provision of "Pattern Accounts" for certain clients, where portfolios "are patterned after model portfolios or designated mutual funds managed Davis… [including] Davis New York Venture Fund," and *how Davis conducts identical trades at identical times for the original and pattern account portfolios*:

**Pattern Accounts**

> Davis Advisors serves as investment adviser for a number of clients which are patterned after model portfolios or designated mutual funds managed by Davis Advisors. For example, a client pursuing Davis large cap value strategy may be patterned after Davis New York Venture Fund. A client patterned after Davis New York Venture Fund will usually have all of its trading (other than trading reflecting cashflows due to client deposits or withdrawals) aggregated with Davis New York Venture Fund. . .

*See* Davis Form ADV at 29; Davis 2013 SAI at 24.

50.    In sum, with respect to the above-identified Subadvised Pattern Funds (and as-yet unidentified further, similarly "patterned" accounts), the Portfolio Selection Services provided by Davis were not merely *similar* to those provided to the Fund, but *identical*.  Davis caused the Fund and the Subadvised Pattern Funds to buy or sell the same securities at the same times for the same reasons.

51.     Consequently, given the identity in Portfolio Selection Services provided to the Fund and the Subadvised Pattern Funds, comparison of the fees charged for such services is relevant, valid and apt.  The Portfolio Selection Services provided are identical, but the fees paid for such services, as Table 3 demonstrates, are different.

52.    The higher investment advisory fees charged to and paid by the Fund cannot be attributed to any additional, further or more extensive non-Portfolio Selection Services that Davis provides to the Fund but not to the Subadvised Pattern Funds (*e.g.*, Other Services).

53.    To the contrary, Davis' further obligations under the investment sub-advisory agreements for the Subadvised Pattern Funds were similar to its further obligations under the Fund's IAA.  In both cases, Davis' Other Services consisted in large part of similar (1) administrative and compliance functions – such as maintaining books and records; and (2) reporting functions – such as providing periodic reports on funds' portfolios and performance to fund investors, sponsors or boards.  Indeed, the terms of investment sub-advisory agreements

17

with many if not all of the Subadvised Pattern Funds indicate that the Other Services Davis owed to such clients were *more* extensive than those owed to the Fund.[4]

54.     Insofar as Defendants or their affiliates provide other services to the Fund, beyond the investment advisory services discussed above, those services are provided pursuant to separate contracts for separate compensation, in addition to the fees paid to Defendants under the IAA.

**b)     Davis Provides Similar Investment Advisory Services to Further Arm's-Length Clients for Lower Fees**

55.     Table 4 below lists a further eleven (11) current and/or former arm's length investment advisory clients that also contracted for and received mutual fund investment advisory services from Davis pursuant to investment sub-advisory agreements.[5] Table 4 demonstrates, consistent with Table 3, that the investment advisory fees that such arm's length clients paid to Davis were substantially lower than the fees Davis extracted from the Fund

**Table 4**
**Advisory Fees Charged by Davis to the Other Subadvised Funds**

| Fund | Sponsor | Advisor | Sub-advisor | Davis' Sub-Advisory Fees | | |
| --- | --- | --- | --- | --- | --- | --- |
| | | | | **AUM Breakpoints** | **Fee Rate** | **Blended Rate ($20.8 Billion AUM)** |
| **John Hancock Fundamental Value Trust** | John Hancock Variable Insurance Trust | John Hancock Inv. Mgmt. Services | Davis | $0 - $50 million | 0.40% | 0.3013% |
| | | | | $50 - $500 million | 0.35% | |
| | | | | $500 million + | 0.30% | |

---

[4] For example:  (1) for the Metropolitan Davis Venture Value Portfolio, Davis was required, among other things, to "furnish the Manager and the Administrator monthly, quarterly and annual reports concerning transactions and performance of the Portfolio in such form as may be mutually agreed upon, and . . . to review the Portfolio and discuss the management of the Portfolio with representatives or agents of the Manager, the Administrator or the Fund at their reasonable request. . ."; for the EQ/Davis New York Venture Portfolio, Davis was required, among other things, to "keep the Trustees of the Trust and the Manager fully informed in writing on an ongoing basis [and] make regular and periodic special written reports of such additional information concerning the same as may reasonably be requested from time to time by the Manager or the Trustees of the Trust . . ." and "attend meetings with the Manager and/or the Trustees, as reasonably requested, to discuss the foregoing."
[5] The information in Table 4 was extracted from:  (1) SEC filings made by the financial institutions sponsoring the Davis-subadvised funds; and (2) Davis' actual investment advisory contracts with respect to such funds. Unfortunately, many such documents did not adequately disclose the sub-advisory fee rates charged by Davis.

| | | | | | | |
|---|---|---|---|---|---|---|
| **John Hancock Financial Services Trust** | John Hancock Variable Insurance Trust | John Hancock Inv. Mgmt. Services | Davis | ??? | ??? | ??? |
| **John Hancock Core Equity Trust** | John Hancock Variable Insurance Trust | John Hancock Inv. Mgmt. Services | Davis | ??? | ??? | ??? |
| **Masters' Select Equity Fund** | Masters' Select Funds Trust | Litman / Gregory Fund Advisors | Davis | ??? | ??? | ??? |
| **Masters' Select Focused Opportunities Fund** | Masters' Select Funds Trust | Litman / Gregory Fund Advisors | Davis | ??? | ??? | ??? |
| **Meritas U.S. Equity Fund** | Qtrade Financial Group | OceanRock Investments | Davis | ??? | ??? | ??? |
| **MMA Praxis Core Stock Fund** | MMA Praxis Mutual Funds | MMA Capital Mgmt. | Davis | $0 - $100 million | 0.45% | 0.3514% |
| | | | | $100 - $500 million | 0.40% | |
| | | | | $500 million + | 0.35% | |
| **MML Large Cap Value Fund** | MML Series Investment Fund | MassMutual | Davis | ??? | ??? | ??? |
| **Roszel / Davis Large Cap Value Portfolio** | MLIG Variable Insurance Trust | Roszel Advisors, LLC | Davis | all amounts | 0.40% | 0.4000% |
| **SP Davis Value Portfolio** | Prudential Series Fund | Prudential Investments LLC | Davis | $0 - $100 million | 0.45% | 0.3514% |
| | | | | $100 - $500 million | 0.40% | |
| | | | | $500 million + | 0.35% | |
| **SunAmerica Real Estate Portfolio** | SunAmerica Series Trust | SunAmerica Asset Mgmt. Corp. | Davis | $0 - $100 million | 0.45% | 0.3514% |
| | | | | $100 - $500 million | 0.40% | |
| | | | | $500 million + | 0.35% | |
| **AVERAGE** | | | | | | 0.3511% |

56.    As Table 4 indicates, Davis' investment advisory fees were invariably and substantially lower for such clients than for the Fund (or, indeed, than for most other Captive

19

Funds in the Davis Fund Complex).  The Fund paid Davis blended investment advisory fees of 0.50% (or $104 million at $20.8 billion AUM.  Arm's length institutional clients negotiated more favorable rates:   paying, on average, blended investment advisory fees of 0.3511% ($73.0 million at $20.8 billion AUM).   The difference between the fees paid by arm's length versus Captive clients -- $31 million per year – is substantial.

57.   Comparing the comparisons – *i.e.*, the information in Tables 3 and 4 – proffers additional and relevant evidence concerning Davis' investment advisory fee practices.

58.   The main (and only) difference between the funds listed in Tables 3 and 4 is that the Table 3 funds were all similarly patterned after the specific Fund (*i.e.*, funds with not merely similar, but *identical*, investment objectives and strategies), whereas the funds listed in Table 4 (hereinafter, the "Other Subadvised Funds") were not similarly so patterned, but rather featured more diverse and dissimilar investment objectives and strategies.[6]

59.   However, although funds' focus/objectives thus differed from Table 3 to Table 4, *the fees Davis charged did not*.  The average investment advisory fees that Davis charged the two sets of funds are all but identical.

60.   This indicates, contra certain of Davis' representations to the effect that its advisory fees are determined in part by the investment focus/objective of a given fund, that Davis' advisory fees do *not* meaningfully differ according to fund focus/objective.

61.   Rather, the conjoined information from Tables 3 and 4 indicate that client identity, rather than fund focus/objective, explains the different investment advisory fees Davis charges and collects.  The lower fees charged for providing investment advisory services to the Other Subadvised Funds in Table 4 cannot be attributed to differences in investment focus/objectives between such funds and the Fund, because, as Table 3 indicates, even where

---

[6] Specifically, of the 11 funds listed in Table 4, at least 4 were "large cap value" funds, a further 2 were sector-specific (financial and real estate, respectively), and 2 more pursued "socially conscious" investment strategies. While the large cap value funds partially overlap with the Fund (which also focuses on large cap stocks, though not exclusively on "value" stocks), the sector-specific and socially-conscious funds present increasingly less overlap with the Fund.

Davis provided services to funds bearing *identical* investment focus/objectives to the Fund (the Subadvised Pattern Funds), Davis *still* charged lower rates than those charged to the Fund.

### 3.   Comparing Current Fund Fees to Prior Fund Fees

62.   Table 5 below compares currently operative advisory fee rates for the Fund with previously-operative rates (here, for fiscal 2007).

**Table 5**
**The Fund's Investment Advisory Fee Rates in 2007 and 2013**

| Fund AUM | 2007 Rates | Current Rates |
|---|---|---|
| from $0 to $250 million | 0.75% | 0.55% |
| from $250 million to $500 million | 0.65% | 0.55% |
| from $500 million to $3 billion | 0.55% | 0.55% |
| from $3 billion to $4 billion | 0.54% | 0.54% |
| from $4 billion to $5 billion | 0.53% | 0.53% |
| from $5 billion to $6 billion | 0.52% | 0.52% |
| from $6 billion to $7 billion | 0.51% | 0.51% |
| from $7 billion to $10 billion | 0.50% | 0.50% |
| from $10 billion to $18 billion | 0.485% | 0.485% |
| from $18 billion to $25 billion | 0.47% | 0.47% |
| from $25 billion to $33 billion | 0.455% | 0.455% |
| from $33 billion to $40 billion | 0.44% | 0.44% |
| from $40 billion to $48 billion | 0.425% | 0.425% |
| from $48 billion to $55 billion | 0.41% | 0.41% |
| over $55 billion | 0.41% | 0.395% |

63.   The yellow shading highlights where, between fiscal 2007 and fiscal 2013, Davis' fees did *not* change:  namely, at all levels of AUM between $500 million and $55 billion.  Post-2007 advisory fee rate changes were limited to two locations of, respectively, infinitesimal and zero impact:  (1) reductions to the rates applied to first $500 million of AUM (pursuant to a July 1, 2009 amendment to the IAA); and (2) reductions to the rates applied to any AUM in excess of $55 billion (pursuant to an April 1, 2008 amendment to the IAA).

64.   Such "reductions" appear to lack basis in either underlying economic realities or in good faith.  Instead, as discussed below, they appear oriented producing reductions in name only, while emptying such "reductions" of almost any actual reduction in substance.

65.     One of the key economic realities of mutual fund advisory services, as further discussed in Section V.B below, is the economy of scale produced, as AUM increases, with respect to providing investment advisory services.  Once sufficient levels of AUM generate an advisory fee stream capable of paying for the high initial/fixed costs of investment advisory infrastructure (personnel, overhead, research costs, etc.), the marginal costs of providing additional investment advisory services for added, new AUM approaches zero.  Thus, while higher investment advisory fees may be merited at lower AUM levels, they are not at higher AUM levels.  Consequently, as further discussed in Section V.B below, advisory fee rates are often reduced at higher AUM levels to reflect the fact that at such levels they bear little or no relation to costs at all, and instead appear as pure profit.

66.     Here the rate reductions between 2007 and 2013 were limited in practice to the lowest levels of AUM:  namely the rates applied to the first $500 million AUM (which were reduced from an average of 0.70% to 0.55%).[7]  Yet these are precisely the AUM levels at which higher rates are most justified.  Were Davis to cut its rates in accord with underlying objective realities, the places to do would not be at the lowest AUM levels, but at the higher AUM levels where the advisory fee stream turns into pure profit for the investment adviser.  But Davis did not propose any such rate reductions at such higher AUM, higher margin levels.

67.     Similarly, if Davis' rate reductions were motivated by good faith desire to reduce its fees and share, rather than monopolize, economy of scale profits generated by the Fund's size, then Davis, again, could easily have cut rates applying at broad, high AUM levels.  But Davis did the very *opposite*:  Davis (1) cut rates applying to merely the first $500 million of AUM, while (2) *making no change to the rates applying to all of the Fund's remaining AUM* (*i.e.*, the 97.5% of Fund AUM  in the range extending from $500 million to $20 billion).  Davis also (3) cut rates that in theory would apply to AUM exceeding $55 billion – a cut with no practical

---

[7] The rates applicable to the highest AUM subcategory ($55 billion and up) were also lowered, from 0.41% to 0.395%.  However, as Fund AUM currently rest at just above $20 billion, this latter reduction has no practical impact.

effect (as Fund AUM stood just above $20 billion) and no prospect of any such effect (as the Fund would have to nearly triple in size before any such cut would take effect).

68.     In short, the rate cuts proposed by Davis between 2007 and 2013 appear to lack basis in underlying economic realities (economies of scale) and/or in good faith (intent to share, rather than monopolize, the benefits of such economies of scale).  Instead, their only logic appears to be their ability to create an *appearance* of investment advisory fee reductions without achieving the same in substance.

69.     Under the 2007 rates, Davis' investment advisory fees – at $20.8 billion AUM – would amount to $105.21 million.  Under current "reduced" rates they would stand at $104.46 million:  yielding a fee reduction of a mere $750,000, or 0.71% of Davis' former investment advisory fees from the Fund.  Davis' rate cuts – affecting only the rates applied to the first $500 million of AUM, while leaving the rates applied against the next $20.3 billion of AUM untouched – all but vanish in practical effect.

70.     The above comparison of current versus prior investment advisory rates constitutes further evidence that Davis extracted excessive investment advisory fees from the Fund.  Specifically, it demonstrates that Davis did not make logical or good-faith efforts to reduce these investment advisory fees, but instead appeared to endeavor to maintain its current and excessive fee levels under cover of empty rate "reductions."

71.     As further detailed below in Section V.C.3, *infra*, Davis' illogical and impractical rate "reductions" with respect to the Fund are all the more significant when compared with: (1) the actions taken by Davis' non-Captive Fund clients, such as the Subadvised Pattern Funds and Subadvised Other Funds (hereinafter, the "Subadvised Funds"), in light of (2) the poor performance of the Fund and the Subadvised Funds during the 2007-2013 period.

**B.     Economies of Scale**

72.     The retention by Defendants of the benefits resulting from the below-detailed economies of scale in their provision of investment advisory services resulted in investment advisory fees that (1) were (and remain) grossly disproportionate to the investment advisory

services provided, (2) were (and remain) excessive, (3) could not have been the product of an arms' length bargain, and (4) violate § 36(b).  Acceptance of the excessive fees by Defendants was (and remains) a breach of their fiduciary and other duties to the Fund.

1.     **Economies of Scale, Their Role in Excessive Fees, and the Use of Breakpoints to Address these Matters**

73.     Significant economies of scale exist in the investment advisory industry, especially in the area of providing investment advisory services to clients such as the Fund. Economies of scale are created when AUM increase more quickly than the cost of advising and managing those assets.  Such economies of scale exist at the individual fund level, at the Fund Complex level, and also on a more comprehensive basis, encompassing an investment advisor's entire scope of operations, including administrative expenses and advisory services provided to other institutional clients.

74.     Here, as discussed below, the Fund provides Defendants with significant economy of scale benefits at each of these levels:  the Fund, the Davis Fund Complex, and Davis' wider investment advisory operations, such as those provided to the Subadvised Funds.

75.     A simple example of economies of scale arises where AUM increases are due purely to market forces:  *i.e.*, an increase in the *value* of a fund's assets, even as such assets remain constant in amount and kind (1,000 shares of stock rising in value from $10,000 to $20,000).  In this event, the investment advisor services the additional assets at *zero* additional variable cost:  there is no change in the securities held in the portfolios or the number of shareholders in the fund.

76.     More generally, however, the cost of providing Portfolio Selection Services may be $X for the first $500 million of AUM but a mere fraction of $X for the next $5 billion. Although the particular amounts of AUM and particular differential costs may vary, the principle holds generally and arises from multiple factors.

a. First and as mentioned immediately above, AUM increases are often due in large part to mere asset appreciation, rather than to increases in the number or kind of assets (thus necessitating no additional provision of advisory services).

b. Second, AUM can increase by virtue of existing fund holders purchasing more fund shares, which likewise produces no changes to the composition of the fund's portfolio or to the number of fund shareholders, and thus requires no additional provision of investment advisory services.

c. Third, AUM can increase when *new* investors purchase fund shares, but even in this event the additional *investment advisory* costs are *de minimis* as: (1) the additional dollars contributed by new shareholders are simply invested in the same core portfolio of securities already produced by prior investment advisory services; and (2) the additional *administrative* costs of adding new shareholders are borne by other parties (*e.g.*, transfer agents) pursuant to other contracts.

d. Fourth and most basically, the work required to operate a mutual fund does not increase proportionately with the assets under managements.  While initial and fixed operating costs for provision of investment advisory services are substantial (*e.g.*, salaries for research, trading and portfolio management personnel sufficient to manage an entire portfolio; offices to house them; procurement of systems and information necessary to conduct research and manage the portfolio), the variable costs for provision of further investment advisory services for further AUM are much smaller, and often negligible or nonexistent.

77.    Put simply, it does not cost an investment advisor ten times as much to render services to a $20 billion fund as a $2 billion fund.  At some point (a point exceeded by the Fund, with its $20 billion+ of AUM), the additional cost to advise each additional dollar in the Fund

(whether added by a rise in the value of the Funds' securities or additional contributions by current or new shareholders) approaches or equals zero.

78.     The existence of economies of scale in the mutual fund industry has been confirmed by the SEC and the Governmental Accounting Office (the "GAO"), both of whom conducted in-depth studies of mutual fund fees and conclude that economies of scale exist in the provision of investment advisory services.  *See SEC Division of Investment Management Report: Report on Mutual Fund Fees and Expenses* (Dec. 2000) ("SEC Report"), at 30-31; GAO, *Report on Mutual Fund Fees to the Chairman, Subcommittee on Finance and Hazardous Materials, and the Ranking Member, Committee on Commerce, House of Representatives* (2000) ("GAO Report"), at 9.  These findings have been further confirmed by academic research, which also describes the existence of significant economies of scale in the mutual fund industry that are not passed on to shareholders.  See *e.g.* John P. Freeman & Stewart L. Brown, *Mutual Fund Advisory Fees: The Cost of Conflicts of Interest*, 26 J. Corp. L. 610 (2001) (the "Freeman & Brown Study")

79.     Indeed, the legislative history of Section 36(b) recognizes that an investment advisor's failure to pass on economies of scale to the fund is a principal cause of excessive fees:

> It is noted . . . that problems arise due to the economies of scale attributable to the dramatic growth of the mutual fund industry.  In some instances these economies of scale have not been shared with investors.  Recently there has been a desirable tendency on the part of some fund managers to reduce their effective charges as the fund grows in size.  Accordingly, the best industry practice will provide a guide.

S. Rep. No. 91-184, at 5-6 (1969), *as reprinted in* 1970 U.S. Code Cong. & Ad. News, at 4901-02.

80.     While mutual fund economies of scale are provided by (and therefore belong to) the mutual fund itself, mutual fund investment advisors can and often do monopolize the benefits of such economies of scale by continuing to charge high investment advisory fees on AUM even

as AUM rise substantially.  As these fees become increasingly untethered to the costs of providing such services, they become excessive.

81.     To address the matter, share economy of scale benefits, and avoid taking excessive fees, investment advisors now frequently employ a declining rate structure in which the percentage of AUM taken as investment advisory fee declines at higher AUM levels.  This is done by providing a schedule of AUM "breakpoints" (*e.g.*, $500 million, $1 billion, $5 billion, etc.) at which investment advisory fee rates on AUM above such breakpoints decrease.  For example, per the above breakpoint schedule, one rate (the highest) will be applied as the fee for all assets up to $500 million; another, lower rate will be applied as the fee for assets between $500 million and $1 billion; and a third rate, lower still, as the fee for assets between $1 billion and $5 billion.  Such breakpoint-adjusted fee schedules reflect (but do not mirror) the cost efficiencies and economies of scale in the management of mutual fund portfolios as mutual funds' AUM grow.

### 2.     The Fund Generated Significant Economies of Scale with Respect to Investment Advisory Services, but Davis Extracted Excessive Fees by Failing to Share the Benefits of Such Economies of Scale

82.     The Fund, per Defendants "one of the nation's premier large cap equity funds," is Davis' flagship.  As detailed in Section IV.E *supra*, it is by far the largest of all the funds in the Davis Fund Complex; by far the largest of all of Davis' Captive Funds; and by far the largest single contributor to Davis' investment advisory fee stream.  Since its founding approximately 45 years ago in 1969, the Fund's AUM have grown from zero to exceed $20 billion.  Almost all of that growth occurred in the prior 20 years, as the Fund grew from approximately $1.6 billion (in 1995) to $20.8 billion as of July 2014.

83.     While the size of the Fund has grown dramatically, it does not appear – as detailed below – that the *amount* of the investment advisory services provided to the Fund by Defendants, or the *cost* to Defendants of providing such services, has undergone any similar

increase.  Instead, what did experience a similar increase was Defendants' advisory fees, which rose in lockstep with AUM.

84.     First, a substantial portion of the Fund's growth in AUM is the result of pure appreciation of assets values.  As of July 31, 2013 (the end of the most recent fiscal year for which information is available), of the Fund's $20.2 billion in net assets, approximately $10.9 billion represented Fund shareholders' "paid-in capital", while approximately $9.3 billion represented "unrealized appreciation on investments" and "net realized gains from investments." In sum, nearly half of the Fund's current size is a function of asset value appreciation:  a factor that requires zero additional provision of investment advisory services.

85.     Second, while the $10.9 billion of shareholder "paid-in capital" indicates that the Fund has many shareholders, the additional services required to cope with such influx of shareholders and shareholder funds are by and large *not* investment advisory services, but rather various administrative and "back office" services provided by other service providers (*e.g.*, transfer agents) for separate fees set through separate contracts.

86.     Third, as Defendants themselves assert, Defendants manage the Fund's portfolio in a manner that avoids frequent trading and quick portfolio turnover, and that instead favors taking large stakes in smaller number of positions held for the long term.  This has meant, among other things, that the number of securities held in the Fund's portfolio has remained: (1) relatively small, and (2) relatively constant.

87.     For example, in July 1995, when Fund net assets totaled a mere $1.6 billion, the Fund held slightly over 100 different positions in its portfolio.  However, as the Fund thereafter enjoyed tremendous AUM growth, such that Fund net assets exceeded $20 billion at all times from 2001 onwards, the number of positions held in the Fund stayed largely constant.  For example, as of March 31, 2007, the Fund held 87 different positions in its portfolio; as of December 31, 2010, 89 positions; and as of June 30, 2014, 76 positions.  Indeed, viewed over the longer term (*e.g.*, over the near-20 year period from July 1995 to July 2014), it appears if anything that the number of positions held by the Fund has largely *decreased*.

88.     Such relative constancy in the number of positions held by the Fund suggests that the research associated with providing the investment advisory services was little changed even as Fund AUM grew dramatically.  In any event, while the number of holdings fluctuates over time, investment advisory services should show only minor changes in total cost, as such services have not changed significantly.

89.     Fourth, the number of individual portfolio managers that Defendants declare responsible for managing the Fund has held constant for at least decade:  two (at first, Christopher C. Davis and Kenneth C. Feinberg; subsequently, Christopher C. Davis and Danton Goei).

90.     Notwithstanding such indicators that the investment advisory *services* provided by Davis did not grow in the same proportion as Fund AUM, and if anything reached a plateau where they remained largely constant, the investment advisory *fees* received by Defendants: (1) have grown dramatically, and (2) increased in almost exact proportion with the increase in Fund assets.

91.     Specifically, and as Table 6 below details, throughout the 2000-2013 time period, the investment advisory fees that Defendants extracted from the Fund hovered within a couple of basis points of 0.50% of total Fund AUM:

**Table 6**
**Investment Advisory Fees Paid by the Fund to Davis:**
**1995-2013**

| Year Ended July 31, | Blended Rate * | Total Fees |
|---|---|---|
| 2013 | 0.50% | $           101,955,292 |
| 2012 | 0.50% | $           122,109,753 |
| 2011 | 0.49% | $           158,097,624 |
| 2010 | 0.49% | $           158,222,172 |
| 2009 | 0.49% | $           146,109,597 |
| 2008 | 0.47% | $           223,481,974 |
| 2007 | 0.48% | $           211,054,429 |
| 2006 | 0.49% | $           165,859,308 |
| 2005 | 0.50% | $           133,019,467 |

| | | | |
|---|---|---|---|
| 2004 | 0.51% | $ | 112,079,463 |
| 2003 | 0.52% | $ | 87,931,160 |
| 2002 | 0.52% | $ | 106,814,810 |
| 2001 | 0.51% | $ | 110,469,251 |
| 2000 | 0.52% | $ | 86,433,009 |
| 1999 | * | $ | 66,033,452 |
| 1998 | * | $ | 47,535,606 |
| 1997 | * | $ | 22,385,196 |
| 1996 | * | $ | 12,351,657 |
| 1995 | * | $ | 7,587,812 |

* SEC filings relating to the Fund did not disclose blended
rates for years prior to 2000.

92.     Between July 1995 and July 2014, Fund assets grew thirteen-fold, from $1.6 billion to $20.8 billion.  During the same period, as Table 6 above shows, the fees the Fund paid to Davis for investment advisory services also grew thirteen-fold, rising from $7.59 million in 1995 to $101.96 million in 2013.  Such investment advisory fees, rising in perfect lockstep with AUM, thus failed to take into account the economies of scale Davis enjoyed in providing investment advisory services, and monopolized all benefits from economies of scale for Davis itself rather than sharing them with the Fund.

93.     Davis maintained such expropriation even under a fee schedule that included multiple breakpoints.  Close and comparative scrutiny of these Fund fee breakpoints, conducted in Section V.B.3 immediately below suggests that the Fund's breakpoints appear fashioned to create an appearance of fee reduction without actually achieving such reduction in substance.

**3.     Comparative Analysis of Fund and Subadvised Fund Breakpoints Further Exposes Defendants' Excessive Fees and Retention of Economy of Scale Benefits**

94.     Further demonstration of Davis' excessive appropriation of Fund economy of scale benefits is provided in Table 7 below, which compares:  (1) the fee/rate breakpoints applicable to the Fund, as set by Davis for its Captive Fund; with (2) the fee/rate breakpoints

applicable to fourteen (14) current and/or former Subadvised Funds, as negotiated at arm's length between Davis and third-party institutional clients.[8]

**Table 7**
**Comparative Breakpoint Analysis**

| Fund | Type | Davis Fee Breakpoints / Rates | | |
| --- | --- | --- | --- | --- |
| | | **AUM Breakpoints** | **Fee Rate** | **Blended Rate** (\$20.8 Billion AUM) |
| **Davis New York Venture Fund** | Captive Fund | \$0 - \$3 billion | 0.55% | 0.5022% |
| | | \$3 billion - \$4 billion | 0.54% | |
| | | \$4 billion - \$5 billion | 0.53% | |
| | | \$5 billion - \$6 billion | 0.52% | |
| | | \$6 billion - \$7 billion | 0.51% | |
| | | \$7 billion - \$10 billion | 0.50% | |
| | | \$10 billion - \$18 billion | 0.485% | |
| | | \$18 billion - \$25 billion | 0.47% | |
| | | \$25 billion - \$33 billion | 0.455% | |
| | | \$33 billion - \$40 billion | 0.44% | |
| | | \$40 billion - \$48 billion | 0.425% | |
| | | \$48 billion - \$55 billion | 0.41% | |
| | | \$55 billion + | 0.395% | |
| **AZL Davis NY Venture Fund** | Subadvised Pattern Fund | \$0 - \$100 million | 0.45% | 0.3514% |
| | | \$100 - \$500 million | 0.40% | |
| | | \$500 million + | 0.35% | |
| **Columbia Variable Portfolio - Davis New York Venture Fund** | Subadvised Pattern Fund | \$0 - \$100 million | 0.45% | 0.2550% |
| | | \$100 - \$500 million | 0.40% | |
| | | \$500 million - \$1 billion | 0.30% | |
| | | \$1 billion + | 0.25% | |
| **DWS Davis Venture Value VIP** | Subadvised Pattern Fund | \$0 - \$100 million | 0.50% | 0.4014% |
| | | \$100 - \$500 million | 0.45% | |
| | | \$500 million + | 0.40% | |
| **EQ/Davis New York Venture Portfolio** | Subadvised Pattern Fund | \$0 - \$150 million | 0.43% | 0.3514% |
| | | \$150 - \$500 million | 0.40% | |
| | | \$500 million + | 0.35% | |

---

[8] The 14 Subadvised Funds included in Table 7 are those 14 of the Subadvised Funds listed in Tables 3 and 4 for which precise fee information was publicly available.

| | | | | |
|---|---|---|---|---|
| **Genworth Davis NY Venture Fund** | Subadvised Pattern Fund | all amounts | 0.40% | 0.4000% |
| **ING Davis New York Venture Portfolio** | Subadvised Pattern Fund | $0 - $50 million | 0.35% | 0.3007% |
| | | $50 - $500 million | 0.325% | |
| | | $500 million + | 0.30% | |
| **Metropolitan Davis Venture Value Portfolio** | Subadvised Pattern Fund | $0 - $100 million | 0.45% | 0.3300% |
| | | $100 - $500 million | 0.40% | |
| | | $500 million - $3 billion | 0.35% | |
| | | $3 billion + | 0.325% | |
| **SC Davis Venture Value Fund** | Subadvised Pattern Fund | $0 - $100 million | 0.45% | 0.3514% |
| | | $100 - $500 million | 0.40% | |
| | | $500 million + | 0.35% | |
| **SunAmerica Davis Venture Value Portfolio** | Subadvised Pattern Fund | $0 - $100 million | 0.45% | 0.3514% |
| | | $100 - $500 million | 0.40% | |
| | | $500 million + | 0.35% | |
| **John Hancock Fundamental Value Trust** | Other Subadvised Fund | $0 - $50 million | 0.40% | 0.3013% |
| | | $50 - $500 million | 0.35% | |
| | | $500 million + | 0.30% | |
| **MMA Praxis Core Stock Fund** | Other Subadvised Fund | $0 - $100 million | 0.45% | 0.3514% |
| | | $100 - $500 million | 0.40% | |
| | | $500 million + | 0.35% | |
| **Roszel/Davis Large Cap Value Portfolio** | Other Subadvised Fund | all amounts | 0.40% | 0.4000% |
| **SP Davis Value Portfolio** | Other Subadvised Fund | $0 - $100 million | 0.45% | 0.3514% |
| | | $100 - $500 million | 0.40% | |
| | | $500 million + | 0.35% | |
| **SunAmerica Real Estate Portfolio** | Other Subadvised Fund | $0 - $100 million | 0.45% | 0.3514% |
| | | $100 - $500 million | 0.40% | |
| | | $500 million + | 0.35% | |
| **AVERAGE - SUBADVISED FUNDS** | | | | **0.3463%** |

95.     Most broadly, Table 7's comparative breakpoint analysis demonstrates that the breakpoint schedules negotiated by Davis' third-party clients at arm's length do a better job of restraining Davis' operative investment advisory fees.

96.     At $20.8 billion of AUM, the breakpoints negotiated by such third-party clients yield, on average, operative/blended investment advisory fee rates of slightly under 0.35% (0.3463%).   Conversely, the breakpoints established by Davis for its Captive Fund yield operative/blended investment advisory fee rates of slightly over 0.50% (0.5022%).   Translated into dollar terms, the more favorable breakpoint schedules negotiated by third party clients would result, at $20.8 billion AUM, in investment advisory fees of $72.04 million, while the less favorable breakpoint schedules "negotiated" by captive clients such as the Fund would result in investment advisory fees of $104.46 million.   The difference is material:   the Fund pays $32.42 million more per year (a mark-up of 45%) than Davis' non-captive clients.   The difference is all the more remarkable in light of the fact that many non-captive clients (*e.g.*, the Subadvised Pattern Funds) procured effectively *identical* investment advisory services from Davis as those Davis provided to the Fund.

97.     More specifically, closer comparative examination of breakpoints reveals the exact factors responsible for this fee disparity between Captive and non-Captive Davis fund clients.

98.     First, the Fund's fee breakpoints *began* at higher rates than those negotiated for the Subadvised Funds.   Specifically, Fund advisory fee rates began at 0.55% for the first AUM levels, while Subadvised Fund rates generally began 10 basis points lower, at 0.45%, and on occasion lower still (0.43%, 0.40% or 0.35%).

99.     Second, and most crucially, as AUM rose, the Fund's fee rate breakpoints declined *far* more gradually than those negotiated for the Subadvised Funds.   As Table 7 indicates and as detailed below, where the Subadvised Funds generally enjoyed a quick 10 basis point reduction in rates by the time AUM exceeded $500 million, *the Fund did not enjoy a similar 10 basis point rate reduction until AUM exceeded $33 billion*.   Put simply, although

Davis provided the Fund with a declining rate structure, that structure allowed rates to decline 66 times more slowly than the structures demanded by Davis' non-Captive clients.

100.    Specifically, most of the Subadvised Funds, on top of starting out at lower rates, reduced those rates more quickly, so that, generally, rates declined by 10 basis points by the time AUM exceeded $500 million. Seven (7) of the Subadvised Funds reduced rates from 0.45% to 0.35% as AUM rose from $0 to $500 million; two (2) more reduced higher/lower starting rates (0.50%, 0.40%) by a similar 10 basis points over the same AUM levels; and two (2) more reduced rates over the same AUM range slightly less (8 basis points) or slightly more (15 basis points).

101.    Conversely, even as the Fund's rates started out higher (0.55%), they were reduced far more slowly through breakpoint reductions as AUM rose.  This was a function of two factors:

    a.  **Smaller Rate Reductions at Each Breakpoint**.  As the Fund's breakpoint schedule shows, the rate reductions at successive breakpoints were invariably *tiny*:  most often merely 1 basis point (i.*e.*, 0.01%), though at AUM exceeding $10 billion on occasion rising to 1.5 basis points (i.*e.*, 0.015%).  Thus, the Fund took five such breakpoints to achieve the same rate reduction, 5 basis points, that the Subadvised Funds achieved, near-invariably, through just one breakpoint.

    b.  **Wider Spacing of Breakpoints over Larger AUM Ranges**.  Whereas nearly all of the Subadvised Funds enjoyed two breakpoint rate reductions (of 5 basis points each) by the time AUM exceeded $500 million, the Fund featured no breakpoints at all until AUM exceeded $3 billion.  At that point, the rate reductions that began to kick in were, as discussed above, tiny (1 basis point, rather than 5 basis points).  After 4 such breakpoint reductions spaced at $1 billion AUM increments, aggregate rate reductions did not reach 5 basis points until AUM exceeded $7 billion.  Finally, after AUM exceeded $10

34

billion, breakpoints (still featuring only 1 or 1.5 basis point rate reductions) were provided only in alternating $7 billion / $8 billion AUM increments (e.g., a new breakpoint for AUM of $10 billion to $18 billion, followed by a new breakpoint for AUM of $18 billion to $25 billion).

102.    The end result of these two factors was that the Fund's breakpoints, widely spaced and providing for very small reductions at each point, were largely defanged.  In sum, they operated to lower fee rates by a mere eight (8) basis points over an AUM range of $20 billion. Conversely, 11 of 14 Subadvised Funds, with more tightly spaced breakpoints providing more substantial reductions at each point, produced equal or higher rate reductions (usually, 10 basis points) much more quickly:  by the time AUM exceeded $500 million.[9]  Indeed, to enjoy the same rate reduction (10 basis points) that the Subadvised Funds quickly achieved over their first $500 million of AUM, the Fund required AUM to exceed $33 billion – a range 66 times larger, or, put differently, a rate of reduction 66 times slower.

103.    The foregoing comparative breakpoint analysis further demonstrates that the investment advisory fees Davis extracted from the Fund are excessive, and that Davis improperly monopolized for itself economy of scale benefits that belong to the Fund and its shareholders.

104.    Two further factors provide this comparative analysis with additional weight.

105.    First, although the Fund's large size produces far more substantial economies of scale (as compared to much smaller Subadvised Funds), the Fund – counterintuitively – does *less* to share such economy of scale benefits than do the Subadvised Funds. Underpinning such breakpoints and economy of scale considerations is the objective reality that as fund AUM grow ever larger, the marginal costs to the investment advisor of providing additional advisory services respecting such AUM grow ever smaller – and, at a certain level, effectively become zero.  The Fund, with $20.8 billion of AUM, has passed this point of vanishing marginal costs,

---

[9] The three exceptions only further prove the larger point.  Two of the Subadvised Funds featured no breakpoint schedules at all, and instead negotiated flat rates of 0.40% -- still substantially lower than the Fund's operative blended rate of 0.5022%.  One Subadvised Fund featured rate reductions of only 5 basis points over the first $500 million of AUM – but because that fund's *initial* rate of 0.35% was already *lower than the initial rates for all other Subadvised Funds*, that fund's operative/blended rate (0.3007%) was the second-lowest of all the Subadvised Funds.

whereas the Subadvised Funds, with AUM generally in the hundreds of millions (rather than tens of billions) of dollars, have not.  Therefore, all other things equal, the objective economies of scale for the Fund would be substantially greater than for the Subadvised Funds, thus meriting more substantial and steep fee reductions through breakpoints at the Fund than at the Subadvised Funds.  But this has not occurred.  In fact, the very opposite reigns:  the Fund's breakpoints provide for *less* sharing of economy of scale benefits than do the breakpoints of the smaller, Subadvised Funds.

106.    In sum, although the size disparity between the Fund and the Subadvised Fund would indicate objectively that *steeper* breakpoint rate cuts would be merited at the Fund than at the Subadvised Funds, the fact that the very opposite has occurred is further evidence of Davis' captivation of the Fund in contravention of the interests of Fund shareholders.

107.    Second, as further discussed in Section V.E *infra*, many of the Subadvised Funds – specifically, the Subadvised Pattern Funds – were *de facto* copies of the Fund itself.  As mere copies, they required almost no additional investment advisory work over and above that already performed for the Fund, and imposed almost no additional investment advisory costs other than those already paid for by the Fund.  Davis' ability to realize a separate and additional fee stream from such Subadvised Pattern Funds was predicated on investment advisory services and infrastructure provided by the Fund and its shareholders. Consequently, Davis' advisory fees from such Subadvised Pattern Funds constituted "fall-out benefits" that Davis improperly retained for itself rather than sharing with Fund shareholders.  Furthermore, although Davis was able to reduce its advisory fees on such Subadvised Pattern Funds in light of their negligible investment advisory costs, *such fee reductions provided no benefit to the Fund or to Fund shareholders, but instead merely benefited the third-party clients who retained Davis to manage the Subadvised Pattern Funds*.  To the contrary, the excessive investment advisory fees paid by the Fund and Fund shareholders to Davis underwrote Davis' ability to offer lower advisory fee rates to such third-party clients.

**C.     The Nature and Quality of Services Provided to the Fund's Shareholders**

**1.     The *Nature* of the Services Davis Provided to the Fund under the IAA**

108.    To illuminate the particular services Davis provided to the Fund, three distinctions are necessary.

a.  First, the services *Davis* provided to the Fund must be distinguished from services provided by *other* entities.

b.  Second, the services Davis provided to the Fund under the IAA must be distinguished from any further services Davis provided to the Fund *outside* those contracted for through IAA.

c.  Third and lastly, the multiple services Davis provided to the Fund under the IAA – namely, Portfolio Selection Services and Other Services – must be distinguished from each either.

109.    Mutual funds require many different services for their operation, almost all of which are provided by entities *other than* the investment advisor.

110.    The Fund's various SEC filings details these expenses (*see* 2013 Annual Report, at 15 and 20; *see also* 2013 SAI at 42, 50).  They include securities custody services (provided by State Street Bank and Trust Company, as custodian), transfer agent services (provided by Boston Financial Data Services, Inc., as transfer agent), audit and accounting services (provided by KPMG LLP), legal services (provided by Greenberg Traurig LLP), shareholder reporting services, the services of Fund Directors, compliance-related services, and distribution services.

111.    None of these services are provided by Davis or covered under the IAA.  All are provided by various other entities (custodians, transfer agents, auditors, counsel, distributors, etc.) pursuant to agreements with such entities, for which such entities are paid fees.  *See e.g.* 2013 Prospectus at 26 ("*Other Expenses*.  Other expenses include miscellaneous fees from affiliated and outside service providers.  These fees may include legal, audit, custodial fees, the costs of printing and mailing of reports and statements, automatic reinvestment of distributions and other conveniences, and payments to third parties that provide recordkeeping services or

administrative services for investors in the Fund"); *see also* IAA at Clause 5 (listing costs and expenses to be borne by the Fund, rather than by Davis).

112.    Davis provides the Fund with a specifically-delimited set of services.  These include, in addition to what Davis terms its "core investment advisory services" under the IAA (*see* 2013 Prospectus, at 25), certain additional services for which the Fund separately reimburses Davis.  *See* 2013 SAI at 42.  However, these additional services – which are comprised "Accounting and Administrative Services" and "Investor Services" – appear to be quite minor, as total payments for them during fiscal 2013 ($1.52 million) pale in comparison to the investment advisory fees paid to Davis during the same period ($101.96 million).  As Davis itself summarized:

> . . . The Fund bears all expenses other than those specifically assumed by the Adviser under the Advisory Agreement, including preparation of its tax returns, financial reports to regulatory authorities, dividend determinations, transactions and accounting matters related to its custodian bank, transfer agency, custodial and investor services, and qualification of its shares under federal and state securities laws. The Fund reimburses the Adviser for providing certain services, including accounting and administrative services, and investor services. Such reimbursements are detailed below . . .

*See* 2013 SAI at 42; *see also* 2013 Annual Report at 20.

113.    Therefore, the particular services Davis provides to the Fund boils down to the "investment advisory services" specified in the IAA, in exchange for which it is paid its investment advisory fees.

114.    In their largest and core part, such services are Portfolio Selection Services: namely, researching potential investments, deciding which securities to purchase for or sell from the Fund's investment portfolio, and arranging for the execution of purchase and sale orders on behalf of the Fund.  Davis terms these functions its "core investment advisory services" (*see* 2013 Prospectus, at 25).

115.    Stripped of fancy or vague terminology, the nature of such Portfolio Selection Services is straightforward:  Davis, based on its research and judgment, at its discretion, selects (purchases, sells or holds) and trades stocks, bonds and other securities for the Fund.  *See e.g.* IAA at Clause 1 ("We desire to employ you to supervise and assist" in "investing and reinvesting" the "capital of Davis New York Venture Fund. . .").

116.    As SEC filings concerning the Funds, as well as quarterly and/or annual "Manager Commentaries" penned by Davis and provided on Davis' website, make clear, Davis' actions in selecting, purchasing and selling securities on behalf of the Fund are the primary metric on which Davis, and Fund investors, judge Davis' performance of its IAA-specified duties.

117.    The IAA also requires Davis to perform limited Other Services, namely: (1) to maintain certain books and records relating to the investment advisory services provided to the Fund; and (2) to report to the Fund's Board regarding the investment advisory services.  *See e.g.* IAA at Clause 3 ("You will furnish us with such statistical information with respect to the securities which we may hold or contemplate purchasing as we may request. . . "); *see also* 2013 SAI at 42 ("Pursuant to the Advisory Agreement, the Adviser, subject to the general supervision of the Fund's Board of Directors, provides management and investment advice and furnishes statistical, executive and clerical personnel, bookkeeping, office space and equipment necessary to carry out its investment advisory functions and such corporate and managerial duties as requested by the Board of Directors of the Fund.").

### 2.    The *Quality* of the Services Davis Provided to the Fund

118.    The Portfolio Selection Services provided by Defendants to the Fund are of low quality, are inferior to the services provided by other mutual fund investment advisers, and have caused the Fund's investment portfolio to perform poorly.

119.    Like other mutual funds, the Fund reports its investment performance relative to a benchmark.  At all relevant times, the Fund's benchmark has been the S&P 500 Index (the "S&P

500"), an unmanaged index of 500 common stocks, consisting primarily of large-capitalization companies listed on the New York Stock Exchange.

120.    According to Morningstar, Inc., a provider of research regarding mutual funds and other investments, the Fund's investment performance has been lower than the S&P 500 for each of the 1-, 3-, 5-, and l0-year periods ended May 31, 2014, as shown in the following chart:

### Fund Performance vs. Benchmark
#### (returns through 5/31/2014)

|  | 1 Year | 3 Year | 5 Year | 10 Year |
|---|---|---|---|---|
| **Davis New York Venture Fund** | 18.12% | 11.82% | 15.37% | 6.78% |
| **S&P 500** | 20.45% | 15.15% | 18.4% | 7.77% |
| **Difference** | -2.32% | -3.32% | -3.03% | -0.99% |

121.    Morningstar also reports Fund investment performance relative to that of other mutual funds that Morningstar has determined are comparable to the Fund.  Morningstar categorizes the Fund as a "Large Blend" fund, and as demonstrated in the chart below, the Fund's investment performance has been below average relative to other funds in Morningstar's Large Blend category for each of the 1-, 3-, 5-, and l0-year periods ended May 31, 2014:

### Fund Performance vs. Peers
#### (returns through 5/31/2014)

|  | 1 Year | 3 Year | 5 Year | 10 Year |
|---|---|---|---|---|
| **Davis New York Venture Fund** | 18.12% | 11.82% | 15.37% | 6.78% |
| **Large Blend Category Average** | 19.22% | 13.40% | 16.95% | 7.31% |
| **Difference** | -1.10% | -1.58% | -1.58% | -0.53% |

122.    Morningstar assigns mutual funds, including the Fund, a rating of 1 to 5 "stars" based on risk-adjusted returns for each of the most recent 3-, 5-, and l0-year periods.  The top l0% of funds within each Morningstar category (*e.g.*, Large Blend) receive 5 stars, the next 22.5% receive 4 stars, the next 35% receive 3 stars, the next 22.5% receive 2 stars, and the bottom 10% receive 1 star.  Morningstar also assigns each fund an "overall" rating.

123.   As of May 31, 2014, Morningstar: (1) rated the Fund 1 star for the most recent 3-year period, putting the Fund in the bottom 10% of the Large Blend category for that time period; (2) rated the Fund 2 stars for each of the most recent 5- and 10-year periods, putting the Fund in the bottom third of the Large Blend Category for those periods; (3) assigned the Fund an "overall" rating of 2 stars, putting the Fund in the bottom third of the Large Blend category.

### 3.   Comparison of the Nature and Quality of the Services Davis Provided to the Fund and to the Subadvised Funds Further Indicates That Davis  Charged Excessive Fees to the Fund

124.   The investment advisory services that Davis provided to the Fund are substantially similar – in nature and quality – to the investment advisory services that Davis provided to third-party, arm's length investment advisory clients, such as the Subadvised Funds.

125.   As detailed above. Davis provided the Subadvised Funds with the same two categories of investment advisory services:  Portfolio Selection Services and Other Services.  As detailed above, the Other Services provided to the Subadvised Funds – namely, periodic reporting functions concerning fund portfolio and performance, and book-keeping functions – were substantially similar to the Other Services that Davis provided to the Fund.  Moreover, and as detailed above, the Portfolio Selection Services that Davis provided to many of its arm's-length investment advisory clients, such as the Subadvised Pattern Funds, were not merely similar to, but *identical* to, the Portfolio Selection Services that Davis provided to the Fund.

126.   Consequently, and as further detailed immediately below, the *quality* of the Portfolio Selection Services that Davis delivered to arm's length investment advisory clients, such as the Subadvised Pattern Funds, was of similar and/or identical low quality as those Davis delivered to the Fund.  Because the Subadvised Pattern Funds and other Davis investment advisory accounts were *de facto* copies of the Fund, the Subadvised Pattern Funds and other like Davis investment advisory accounts experienced the same poor performance as the Fund.

127. However, although the investment advisory services delivered to the Fund and to the Subadvised Funds were similar and often effectively identical, there are two matters where the experiences of the Fund and the Subadvised Funds diverge.

128. First, and as detailed above (*see* Sections V.A.2.a and V.B.3, *supra*), the Subadvised Funds paid materially lower fees than the Fund did in order to receive the same, relatively poor investment advisory services.

129. Second, and as demonstrated in Table 8 below, the Subadvised Funds responded very differently than the Fund to the receipt of such relatively poor investment services. In overwhelming numbers, they "walked away:" they ended their investment sub-advisory relationships with Davis, and instead retained new and different investment sub-advisors to provide them with (better) investment advisory services.

**Table 8**

**SubAdvised Funds' Responses
to the Quality of Davis' Investment Advisory Services**

| Fund | Type | Old Subadvisor | Davis Termination Date | New Subadvisor |
|---|---|---|---|---|
| **AZL Davis NY Venture Fund** | Pattern Fund | Davis | November 2013 | T. Rowe Price |
| **Columbia Variable Portfolio - Davis New York Venture Fund** | Pattern Fund | Davis | November 2012 | Sit Investment Associates |
| **DWS Davis Venture Value VIP** | Pattern Fund | Davis | November 2008 | DIMA |
| **EQ/Davis New York Venture Portfolio** | Pattern Fund | Davis | June 2014 | FMG LLC and Invesco Advisers |

| | | | | |
|---|---|---|---|---|
| **Genworth Davis NY Venture Fund** | Pattern Fund | Davis | n/a (ceased operations November 2012) | n/a |
| **ING Davis New York Venture Portfolio** | Pattern Fund | Davis | January 2013 | Columbia Mgmt. |
| **Metropolitan Davis Venture Value Portfolio** | Pattern Fund | Davis | February 2014 | Wellington Mgmt. Co. |
| **SC Davis Venture Value Fund** | Pattern Fund | Davis | 2012 | MFS |
| **SunAmerica Davis Venture Value Portfolio** | Pattern Fund | Davis | n/a | n/a (Davis) |
| **John Hancock Fundamental Value Trust** | Other Fund | Davis | n/a | n/a (Davis) |
| **John Hancock Financial Services Trust** | Other Fund | Davis | June 2014 | John Hancock Asset Mgmt. |
| **John Hancock Core Equity Trust** | Other Fund | Davis | n/a (merged into John Hancock Fundamental Value Trust, April 2009) | n/a (merged into John Hancock Fundamental Value Trust, April 2009) |
| **Masters' Select Equity Fund** | Other Fund | Davis | n/a | n/a (Davis) |
| **Masters' Select Focused Opportunities Fund** | Other Fund | Davis | n/a (merged into Masters Select Equity, December 2013) | n/a (merged into Masters Select Equity, December 2013) |
| **Meritas U.S. Equity Fund** | Other Fund | Davis | June 2011 | Legg Mason / Clearbridge Advisors |
| **MMA Praxis Core** | Other Fund | Davis | n/a | n/a (Davis) |

| | | | | |
|---|---|---|---|---|
| **Stock Fund** | | | | |
| **MML Large Cap Value Fund** | Other Fund | Davis | April 2013 | Gateway Investment Advisers |
| **Roszel/Davis Large Cap Value Portfolio** | Other Fund | Davis | n/a (ceased operations in 2010) | n/a (ceased operations in 2010) |
| **SP Davis Value Portfolio** | Other Fund | Davis | April 2010 | Jennison Associates |
| **SunAmerica Real Estate Portfolio** | Other Fund | Davis | September 2013 | Pyramis Global Advisors |

130.     Specifically, as Table 8 above shows, of the nine (9) Subadvised Pattern Funds whose investments and performance were *de facto* copies of the Fund, only one (1) now continues to retain Davis as an investment advisor.  Seven (7) of the Subadvised Pattern Funds terminated their investment advisory relationships with Davis and instead procured different investment advisory services from different investment advisors.[10]  Although one (1) of the Subadvised Pattern Funds replaced Davis as early as 2008, the other seven (6) replaced Davis recently, between 2012 and 2014.

131.     Likewise, as Table 8 above indicates, the same pattern holds more generally:  not merely for Davis-advised funds modeled on the Fund, but for *all* non-Captive funds advised by Davis.  Of the eleven (11) Other Subadvised Funds, only three (3) still continue to retain Davis as an investment adviser.  Five (5) such funds terminated their investment advisory relationships with Davis and instead procured different investment advisory services from different investment advisor (the remaining three (3) were discontinued due to mergers or liquidations).

132.     The more severe reaction among the Subadvised Pattern Funds (where 7 of 9 such funds acted to replace Davis with other investment advisors) than among the Other Subadvised

---

[10] The remaining 1 (one) Subadvised Pattern Fund ceased operations in 2012.

Funds (where 5 of 11 did so) further indicates that the quality of the investment advisory services delivered to the Subadvised Pattern Funds – and thus, necessarily, to the Fund itself – has been *especially* poor.

133.   While Davis' arm's-length clients have largely, in light of the poor quality of the investment advisory services they received, walked away from Davis, the Fund has not.

134.   To the contrary, the Fund not only continues to retain Davis to provide it with investment advisory services, but continues to pay substantially higher fees than those negotiated and paid by Davis' arm's-length clients.   Whereas during the 2008-2014 period Davis' non-Captive clients responded to the poor quality of Davis' investment advisory services by terminating such services and refusing to pay Davis any further, the Fund's response during the same period to the same poor quality was far more mild:  as detailed in Section V.A.3, *supra*, an advisory fee cut so small as to be next to nonexistent.

135.   The Fund's continued retention of Davis and excessive fee payments to Davis, even in light of the poor quality of the services received (which caused most arm's-length investment advisory clients to walk away), are vivid illustration of the Fund's captivation by Davis.   Indeed, all of the Captive Funds in the Davis Fund Complex, including the Fund, continue to retain Davis, even as Davis' arm's-length investment advisory clients have walked away from Davis in large numbers.

**D.   The Profitability of the Fund to the Advisor**

136.   Defendants are privately-held entities, and as such do not publicly disclose their results of operations, or financial statements, or any other similar information indicating their profits from investment advisory services generally or from the Fund particularly.   These facts therefore, remain in the first instance within the peculiar knowledge of Defendants.   Upon information and belief, as supported by the factual allegations below, discovery will evidence that Defendants enjoy substantial profits from the (excessive) investment advisory fees they extract from the Fund.

137.    First, as detailed at Section IV.E *supra*, the Fund is the flagship fund of the Davis Fund Complex.  The Fund's $20.8 billion of AUM more than octuple the combined AUM of all the other funds in the Davis Fund Complex ($2.55 billion), and represent more than 89% of all the $23.35 billion of AUM under Davis' management in the Davis Fund Complex.

138.    Consequently, the investment advisory fees extracted by Davis from its Captive Funds are largely a matter of the fees extracted from the Fund. Concretely, during fiscal 2013, the Fund paid $101.96 million in investment advisory fees to Davis, while Davis' combined investment advisory fees from the nine other funds in the Davis Fund Complex totaled approximately $14.0 million.

139.    Were Davis to allocate investment advisory expenses among the funds in the Davis Fund Complex accurately – *i.e.*, not in proportion to their AUM, but rather in a manner that directly reflected the actual costs to provide each fund's investment advisory services – it would appear, on information and belief, that the Fund would be, by far, the most profitable of all the funds in the Davis Fund Complex.  Indeed, it is possible that the many or all of the other funds in the Davis Fund Complex – due to their small AUM size, small resulting fee stream, and the high initial/fixed costs for provision of investment advisory services – are not profitable at all, and that their continued operation is made possible and subsidized by the large profits extracted from the Fund.

140.    Second, while the Fund, by itself, represents almost half (44.13%) of *all* $47.129 billion of AUM under Davis' discretionary management (including, besides the Captive Funds in the Davis Fund Complex, funds managed for arm's length investment advisory clients), Davis is able to extract higher fees from the Fund than from its arm's length investment advisory clients. The evidence presented herein indicates that the fees paid by the Fund appear, on average, to be approximately 50% higher than those paid by Davis' arm's length clients.  This in turn indicates that Davis' overall investment advisory income is even more disproportionately derived from the Fund, such that although the Fund contributes 44% of Davis' total AUM, it produces approximately 57% of Davis' total investment advisory fees.  Again,  in light of its large size and

the resultant economies of scale, as well as the far smaller size of all other investment accounts managed by Davis and their high/initial fixed costs, it appears that the Fund is not only substantially profitable for Davis, but that its profits may underwrite Davis' ability to offer further investment advisory services.

141.     Third, as detailed in Section V.B, *supra*, the Fund produces significant economies of scale with respect to the investment advisory costs it requires, but these economies of scale are monopolized by Davis through a fee structure that operates in effect as if such economies of scale did not exist.   Although Davis' investment advisory fee rates include multiple AUM breakpoints at which advisory rates are reduced, the rate reductions are so tiny, and spaced so widely apart, as to be almost wholly inconsequential.   This indicates both that management of the Fund is tremendously profitable for Davis and that such profits are the result of Davis charging and extracting excessive fees.

142.     Fourth, as detailed in the following section concerning "fall out benefits," the Fund, by serving as the original which Davis can endlessly copy at almost no additional cost through Subadvised Pattern Funds and other similar accounts modeled on the Fund, provides Davis with further income and profits from the investment advisory fee streams Davis can collect from such offers.

143.     Fifth and lastly, evidence produced in the course of prior excessive fee litigations further indicates that investment advisors enjoy substantial and on occasion extremely high profit margins on large funds such as the Fund.

        a.     In excessive fee litigation relating to five large funds managed by Fidelity Management and Research Co. ("Fidelity"), evidence indicated that Fidelity's pre-tax profit margins on such funds ranged between 72% and 86%.   *See Bennett v. Fidelity Management & Research Co.*, NO. 1:04-cv-11651-MLW (D. Mass.), at Dkt. No. 268 ("Plaintiffs' Supplemental Brief Regarding Summary Judgment"), at 19.

b.   In excessive fee litigation relating to funds managed by Oppenheimer Management Corp., pre-tax profit margins rose as high as 89%.  *See Meyer v. Oppenheimer Mgmt. Corp.*, 707 F. Sup. 1394, 1401 (S.D.N.Y. 1988).

c.   In excessive fee litigation relating to funds managed by Capital Research & Management Co., pre-tax profit margins ranged from 35% to 44%.  *See Am. Mutual Funds Fee Litig.*, 2009 US Dist. LEXIS 120597 (C.D. Cal. Dec. 28, 2009), at *68-71.

d.   In excessive fee litigation relating to funds managed by T. Rowe Price, pre-tax profit margins were estimated to be between 57% and 77.3%.  *See Schuyt v. Rowe Price Prime Reserve Fund, Inc.*, 663 F. Supp. 962, 978-79 (S.D.N.Y. 1987)

**E.   Fall-Out Financial Benefits Attributable to the Fund**

144.   "Fall-out benefits" refer to income, profits or other benefits accruing to Davis that would not have occurred but for the existence of the Fund.  Where an investment manager gains substantial fall-out benefits (over and above direct investment advisory fees) by virtue of a fund or funds it manages, consideration of such benefits is also relevant for any determination as to whether investment advisory fees were excessive.

145.   Here, the Fund afforded Davis two very substantial fall-out benefits.

146.   First, and uniquely, Davis employed the Fund as an original model that it could then endlessly copy for other clients, such as the Subadvised Pattern Funds and other client accounts "patterned" after the Fund, while incurring little or no additional investment advisory costs.  All the infrastructure, research and personnel required to furnish investment advisory services to such "copycat" clients are already provided and paid for by investment advisory fees extracted from the Fund itself.  Davis was thus able to capture for itself a sizeable additional fee stream – namely, the investment advisory fees paid by clients for whom Davis copied the advisory services originally developed and provided to the Fund – that would not have existed but for the Fund.

48

147.    Indeed, the fact that the Fund had already paid for the development of these investment advisory services allowed Davis to offer copies of such services to arm's-length clients *at rates far lower than those it charged to the Fund* (as the marginal costs to Davis of providing such copies services were close to zero). The Fund thus not only made such services possible, but also made them *marketable*: more attractive to Davis' arm's length clients by virtue of the lower fees Davis was able to offer them.

148.    The fee data presented above for the Subadvised Pattern Funds provides some indication of the size of such fall-out benefits. The average operative/blended investment advisory fee that Davis collected from the Subadvised Pattern Funds was 0.3437%. *Id*. Assuming that the already-identified Subadvised Pattern Funds and other similar, as-yet unidentified accounts also patterned after the Fund totaled $10 billion of AUM, Davis would have generated more than $34 million of investment advisory fees per year by copying the Fund, at a discount, for arm's-length clients.

149.    Second, as mentioned above in Section V.D, *supra*, the Fund's large size, the attendant economies of scale for Davis in providing investment advisory services, and Davis' monopolization of economy of scale benefits made the Fund the most profitable of all of Davis' enterprises. Most other Captive Funds in the Davis Fund Complex, however, stood at the opposite operational pole: their small size and small attendant investment advisory fee streams made it difficult for Davis to recoup the high initial/fixed costs of providing them with investment advisory services. Consequently, the excessive fees taken from the Fund and the large profits accruing to Davis from such Fund-derived fees underwrote Davis' ability to continue to operate the other Captive Funds in the Davis Funds Complex -- and to receive from them further investment advisory income. Absent the Fund, it is not certain that Davis would be able to continue to operate these other Captive Funds, or to receive the further fees it generated from doing so.

F.     **The Care and Conscientiousness of the Fund's Directors in Approving Investment Advisory Fees**

150.    Mutual fund investment advisory fees are "set" (reviewed, evaluated and approved) by nominally-independent mutual fund directors on an annual basis.

151.    Evaluation of whether or not fund directors have approved excessive investment advisory fee involves examination of two analytically distinct, but related, matters:

      a.   *procedure* (the process through which the fee was evaluated and approved), and

      b.   *substance* (the fee itself, apart from the procedure that produced it).

152.    A fee can be excessive in substance wholly apart from whether the procedure used in setting it was sufficient or defective.  Where the fee-setting process appears deficient, indications that the fee is substantively excessive are accorded all the more weight.

153.    Here, the Fund's investment advisory fees were excessive in substance, and the process through which the Fund's directors "set" such fees was deficient.

### 1.     The Board Approved Substantively Excessive Advisory Fees

154.    Matters of process or procedure aside, the investment advisory fees approved by the Fund directors were excessive, in substance and result, for the reasons set forth in Sections V.A-E *supra*.

155.    Upon information and belief, as detailed below, the Board's approval of substantively excessive fees stemmed in part from a deficient process for the consideration, evaluation and approval of proposed and/or appropriate advisory fees for the Fund.

### 2.     The Board's Deficient Approval Process

156.    Notwithstanding that nominally-independent mutual fund directors must approve, and thus set, investment advisory fees annually, as a practical matter, investment advisors are largely responsible for setting their Captive Fund investment advisory fees, by virtue of exerting effective control over the fee-setting process.

157.    Typically, and here specifically, such effective control arises from three factors, summarized below.

158.    **Domination of the Directors**.  First, the investment advisor can influence which directors are appointed to a fund's board, and such directors therefore owe their board positions (and associated remuneration and benefits) to the investment advisor.  Second, fund complex structure and practice intensify this conflict, because directors typically serve on the boards of all Captive Funds in a Fund Complex (and thus receive yet higher remuneration and benefits).

159.    **Control Over the Investment Advisory Fees Proposed**.  Mutual fund directors do not themselves propose the investment advisory fees they set.  Rather, in the first instance, the investment advisory fees set before fund directors for consideration and approval are ones proposed by the investment adviser itself.  In all but extremely rare circumstances, mutual fund boards approve or "rubber stamp" the fees proposed by the investment advisor.  As a practical matter and due in part to the factors listed immediately above and below, the investment advisor's fee "proposal" functions as the *de facto* fee determination.

160.    **Domination of the Information Considered by Directors in the Fee Approval Process**.  Typically, in order to evaluate the investment advisor's proposal for advisory fees, fund directors consider further information relevant to such evaluation, most of which is provided in self-serving manner by investment advisor itself.

> a.    **Investment Advisory Fees for Comparable/Peer Mutual Funds**. Fund directors consider information as to the investment advisory fees charged to other and/or peer mutual funds (often termed a "Lipper" report or a "15(c)" report):  such information is often produced by an independent third party (Lipper) and is often supplemented with further, similar information from the investment advisor itself.  However, as most peer mutual funds are themselves Captive Funds, such information is contaminated by such Captive Funds' structural bias to excessive fees, thereby whitewashing excessive fees into purportedly "normal" or "average" ones.

51

b. **Excessive Fee Factors.** Fund directors are also provided, *by the investment advisor*, with further information purportedly relating to the very factors set forth here (*e.g.*, comparative fee structures; economies of scale; profitability of fund to the investment advisor; etc.), which courts, including the Supreme Court, have enshrined as operative measures for excessive fees.  But neither the provision of such information by the investment advisor, on the one hand, nor its consideration by fund directors, on the other hand, suffices to produce a sufficient or appropriate fee-setting process. First, the information provided by the investment advisor is often neither complete nor objective, but instead partial and self-serving, thereby depriving fund board members of relevant and material information for determination of a non-excessive fee.  Second, the board's consideration of such information, coupled with its failure to demand more full, accurate or objective information from the investment advisor, can itself be flawed.   Ultimately, provision and consideration of such information is used less as part of a good faith effort to set non-excessive fees, but rather to set excessive fees immunized from legal challenge or action.

### a) Defendants' Domination of the Fund's Directors

161.    The Fund has had, at all relevant times, six statutorily independent directors – Marc P. Blum; John S. Gates, Jr.; Thomas S. Gayner; Samuel H. Iapalucci; Robert P. Morgenthau and Marsha Williams (the "Fund Directors") – in addition to two non-independent directors (Andrew A. Davis and Christopher C. Davis, who also serve as officers of the Fund and all other funds in the Davis Fund Complex, and as officers and owners of Defendants).

162.    Once nominated and elected to the Board, Fund Directors never stand for re-election, but instead enjoy "life" terms (as limited by resignation, removal, death or mandatory retirement upon reaching 74 years of age).  All of the Fund Directors have lengthy tenures on the Fund's Board, ranging from six years (Mr. Gates) to twenty-seven years (Mr. Blum).

163.   All of the Fund Directors, in addition to serving on the Fund's Board, also serve on the boards all other funds in the Davis Fund Complex.  Each of the Fund Directors received compensation of at least $125,000 (during the fiscal year ended October 31, 2013) in connection with serving as Fund Directors for the Captive Funds in the Davis Fund Complex.

164.   Fund Directors meet four times a year to oversee all of the funds in the Davis Fund Complex. This includes approving investment advisory and other services contracts for each fund, as well as other oversight responsibilities, including, among many others, monitoring each fund's compliance with federal and state law and its stated investment policies, overseeing the daily pricing of each fund's security holdings, and approving each fund's prospectus, annual and semi-annual shareholder reports, and other required regulatory filings.

165.   The long tenure of the Fund Directors, coupled with their persistent lack of action throughout their tenure to restrain Davis from extracting excessive investment advisory fees, indicates that the Fund Directors are effectively dominated and controlled by Defendants.

### b)   Defendants Set Their Own Advisory Fees by Providing Proposed Fees that Fund Directors Rubber-Stamped

166.   The Fund Directors have consistently approved, year after year, the investment advisory fees proposed by Defendants.  There is no indication that the Fund Directors have taken any action, either in the most recent fiscal year or in any of the preceding ones, to reject the advisory fees proposed by Defendants, or to act in any way to reduce or alter such investment advisory fees.

167.   This stands in contradistinction to the record presented by Defendants' arm's-length investment advisory clients, who, during the same time, not only negotiated lower investment advisory fees from Defendants for similar and often identical services, but on multiple occasions also terminated Defendants' investment advisory services altogether in light of poor investment advice/performance.

168.   The Fund Directors' rubber-stamping has allowed Defendants to continue to maintain and enjoy excessive investment advisory fees from the Fund for many years.  Indeed,

and as detailed above, not only have the investment advisory fee rates that Defendants extract from the Fund have remained almost exactly the same over the years, but the few changes to such rates – minor modifications to the breakpoint schedule proposed by Defendants over the years – appear to have been designed to produce only cosmetic, rather than substantive, fee reductions.

169.    In effect, Davis has itself determined the investment advisory fees to which the Fund is subject.

170.    In contrast, Davis's fees for providing investment advisory services to the Subadvised Funds are determined by negotiations between two sophisticated financial institutions: Davis on the one hand and the sponsors of the Subadvised Funds on the other.  The Subadvised Funds' sponsors negotiate at arm's length with Davis regarding the fees paid to Davis for providing investment advisory services to the Subadvised Funds.  By negotiating lower fees with Davis, the Subadvised Funds' sponsors increase the amount of their retained profits.

171.    Likewise in contrast, the Subadvised Funds' sponsors select investment advisers through a competitive selection process, with multiple candidates submitting proposals.  The negotiations include exchanges of proposals and counterproposals, resulting in reductions in the fee rates paid by the sponsors to the investment advisers.

172.    The Fund, as Captive Fund, and the Board, as dominated by Davis, do not engage in any similar such process.  No other proposals from other investment advisors are solicited, submitted or evaluated, and Davis' sole fee proposals are approved in rubber-stamp fashion without reductions achieved through negotiations or counterproposals.

c)    **The Fund Directors' Deficient Process for Evaluation and Determination of Advisory Fees**

173.    The Fund's Board is required to approve the IAA and the fees paid by the Fund under the IAA on an annual basis.  ICA §15(c) requires investment advisers to furnish documents and other information in order for fund directors to make informed and independent

decisions when evaluating investment advisory contracts, and gives directors the authority to demand such information from advisers. *See* 15 U.S.C. § 80a-15(e).

174.   Notwithstanding public disclosures made by Defendants, in SEC filings relating to the Fund, as to the information Defendants furnished and the information the Board requested and considered, the fee-setting process was deficient.   Such disclosures do not reflect Defendants' efforts engage in a good-faith process designed to guard against taking excessive investment advisory fees, but rather reflect Defendants' efforts to shield from legal challenge a deficient process designed to ensure taking excessive investment advisory fees.

175.   In particular, upon information and belief, Defendants do not provide the Fund Directors with sufficient, complete, and/or accurate information needed to fulfill their obligations, a factor demonstrating that the fee setting process lacked good faith and integrity, in violation of ICA § 36(b). Upon information and belief, the Fund Directors are in all practical respects dominated and unduly influenced by Defendants in reviewing the fees paid by the Fund and its shareholders, because all information received by the Fund Directors is packaged and presented by Defendants.

176.   In approving the IAA, the Board relied on information and analyses prepared by Davis and designed to support Davis's rationalization for the fees charged to the Fund. The Board has not considered information or analyses reflecting the interests of the Fund or its shareholders with respect to the investment advisory fees, or critically assessing Davis's rationalization for those fees.

177.   Upon information and belief, Defendants have not provided, and the Board has not considered, adequate information regarding, among other things: the advisory fees charged and services provided by Defendants and/or their affiliates to other accounts; the economies of scale enjoyed or fallout benefits received by Defendants; and the profitability of the Fund to Defendants (and how to evaluate the profitability data in light of economies of scale).

178.   Upon information and belief, the Fund Directors rarely, if ever, question any information or recommendations provided by Defendants, and Defendants have made misleading

representations to the Fund Directors, including representations regarding the services Defendants provide to the Fund as compared to other accounts, representations regarding Defendants' economies of scale in providing services to the Fund, and representations regarding Defendants' profitability.

179.    The Board has uncritically accepted Defendants' representations that the lower fees paid by other clients reflect differences in the services provided to those clients. The Board has not appropriately examined whether the investment advisory services provided to those clients are materially different from the services provided to the Fund under the IAA, or the extent of any such differences. Nor has the Board considered appropriate information about the cost of providing any additional services required by the IAA to assess whether the difference in fees is warranted by any such differences in the services provided.

180.    While the evidence needed to establish the truth of these allegations remains within the peculiar knowledge and exclusive control of Defendants, publicly-available facts support these allegations.

181.    First, as detailed above at Section V.B.2 and Table 6, the operative investment advisory fee rates proposed by Defendants and approved by the Board have stayed effectively the same for many years (since 2000 at least, if not before).

182.    Second, relatedly, the only changes to advisory fee rates proposed by Defendants and approved by Fund Directors during the most recent five year period have been, as detailed above, cosmetic and superficial, rather than substantive.  *See* Section V.A.3, *supra*.  Such reductions thus had a sharply limited effect, resulting in no reduction to operative "blended" fee rates.  *See* Section V.B.2 and Table 6, *supra*.  Ultimately, the fee reductions proposed and taken, bereft of practical effect of theoretical justification, appear to have been designed to create merely the appearance of fee reduction without its substance.  *See* Section V.A.3, *supra*.

183.    Third, throughout this time, there is no indication that the Board did anything other than rubber-stamp the investment advisory fees proposed by Defendants.  There is no indication that the Board ever rejected advisory fees proposed by Defendants, or negotiated for

or demanded lower advisory fees.  To the contrary, the only change in fees during this time appears to have been the deceptive fee "reduction" mentioned immediately above and proposed by Defendants themselves.

184.    Fourth, even as the Board rubber-stamped the excessive investment advisory fees Defendants proposed year after year, numerous arm's-length clients procured *identical* advisory services from Davis for substantially lower fees.  *See* Section V.A.2, *supra*.  Relatedly, the Board has never negotiated a "most favored nation" provision into the IAA, which would require that the fee rate paid by the Fund be at least as favorable as the lowest rate other clients pay for the same or substantially the same investment advisory services.

185.    Fifth, even as the Board has continued to approve the same, excessive investment advisory fees to Defendants, Defendants' investment advice has produced poor investment performance.  The Board has not taken appropriate action to address the fact that Fund shareholders are therefore paying excessive investment advisory fees for inferior investment advisory results.  The Board has neither solicited proposals from other advisers to provide investment advisory services to the Fund, nor negotiated a performance adjustment into the IAA (to reduce fee rates during periods when the Fund underperforms its benchmark), nor negotiated any waiver or reimbursement of investment advisory fees in response to the Fund's poor investment performance relative to its benchmark and comparable mutual funds.

186.    By contrast, as detailed in Section V.C.3 and Table 8 *supra*, many of Defendants' arm's-length clients have taken decisive steps to address the poor quality of Davis's investment advisory services, including terminating Davis and retaining different investment advisors to provide them with investment advisory services.  Proxy disclosures concerning the Subadvised Funds make clear that Davis was terminated for the poor quality of its investment advice.  For example:

> a.  **Columbia Variable Portfolio - Davis New York Venture Fund**:  Davis replaced effective November 2012 "primarily due to consistent underperformance;"

57

    b.  **AZL NY Venture Fund**:  Davis replaced effective November 2013 due to, among other factors, "past performance" under Davis's management, in favor of another investment adviser whose funds "significantly outperformed" the the Davis-managed AZL NY Venture Fund over the previous 10 years;

    c.  **Metropolitan Davis Venture Value Portfolio**:  Davis replaced effective February 2014 because of the fund's "underperforrnance relative to its benchmark" under Davis' management.

187.    All the foregoing, taken together, indicates that the processes through which Defendants and the Board set the Fund's investment advisory fees were materially deficient.

## VI.   THE EXCESSIVE INVESTMENT ADVISORY FEES HARM THE FUND

188.    Investment advisory fees are paid, to Davis, out of the Fund's assets. Each dollar in fees paid by the Fund directly reduces the value of the Fund's investment portfolio by like amount.

189.    Additionally, the payment of excessive investment advisory fees to Davis harms the Fund on a going forward basis because the Fund loses investment returns and profits that it could have earned on the amounts paid out as fees to Davis.

190.    The Fund has sustained millions of dollars in damages due to the excessive investment advisory fees paid to Davis.

## VII.   CAUSES OF ACTION

COUNT I

AGAINST DEFENDANTS FOR VIOLATION OF SECTION 36(b)

191.    Plaintiffs repeat and reallege all of the foregoing allegations as if fully set forth herein.

192.    Plaintiffs assert this Count on behalf of and for the benefit of the Fund.

193.    Defendants are investment advisers to the Fund.

58

194.    Under Section 36(b), Defendants owe a fiduciary duty to the Fund with respect to their receipt of investment advisory fees and other compensation from the Fund.

195.    Defendants breached their fiduciary duty under Section 36(b) by charging investment advisory fees to the Fund that are so disproportionately large that they bear no reasonable relationship to the value of the services provided by Defendants and could not have been the product of arm's-length bargaining.

196.    As a direct, proximate, and foreseeable result of Defendants' breach of their fiduciary duty under Section 36(b), the Fund has sustained millions of dollars in damages.

197.    Pursuant to Section 36(b)(3), Plaintiffs seek to recover, on behalf of and for the benefit of the Fund, the actual damages resulting from Defendants' breach of their fiduciary duty, including the excessive investment advisory fees paid by the Fund to Defendants and investment returns that would have accrued to the Fund had those fees remained in the portfolio and available for investment.

198.    Alternatively, under Section 47 of the ICA, 15 U.S.C. § 80a-46, Plaintiffs seek rescission of the IAA and restitution of all excessive investment advisory fees paid by the Fund pursuant to the IAA.

## VIII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment on behalf of and for the benefit of the Fund, as follows:

  a.   declaring that Defendants have violated Section 36(b), 15 U.S.C. § 80a-35(b), through the receipt of excessive investment advisory fees from the Fund;

  b.   permanently enjoining Defendants from further violations of Section 36(b);

  c.   awarding compensatory damages against Defendants, including repayment to the Fund of all unlawful and excessive investment advisory fees paid to Defendants by the Fund from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

d.   rescinding the IAA pursuant to Section 47 of the ICA, 15 U.S.C. § 80a-46, including restitution to the Fund of the excessive investment advisory fees paid to Defendants by the Fund from one year prior to the commencement of this action through the date of trial, lost investment returns on those amounts, and interest thereon;

e.   awarding Plaintiffs reasonable costs in this action, including attorneys' fees, expert witness fees, and such other items as may be allowed to the maximum extent permitted by law; and

f.   such other and further relief as the Court may deem just and proper.

## IX.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated:   August 22, 2014                          **KIRBY McINERNEY LLP**

By:   _____
Ira Press
825 Third Avenue, 16th Floor
New York, NY  10022
Telephone: (212) 371-6600
Facsimile: (212) 751-2540

*Plaintiffs' Counsel*

60